[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court is the motion for summary judgment of Defendants County Development Associates, LLC ("CDA"), and CVS Corporation, Consumer Value Stores of Rhode Island, Inc., Barrington CVS, Inc. and CVS, Inc. (collectively "CVS") brought pursuant to Super. R. Civ. P. 56. The Plaintiff St. Angelo Motors, Inc. ("Motors") timely has filed an objection to the motion.
 FACTS AND TRAVEL
The parties to this matter represent that the material facts relevant to this motion are undisputed. Motors is the owner and leasor of property located at 244 County Road, Barrington, Rhode Island (the "Motors Property"). In late 1997 John St. Angelo ("St. Angelo"), Motors president was contacted by Attorney Joshua Teverow ("Teverow") on behalf of Robert Pesce ("Developer"), a local developer who has business ties with CVS. Teverow contacted St. Angelo for the purpose of entering into negotiations for the purchase and sale of the Motors Property.[1] Developer instructed Teverow not to disclose his involvement in the deal until such time as he deemed appropriate. According to Developer's deposition testimony knowledge of his involvement in a prospective deal would inflate the prices under negotiation.[2]
On November 25, 1997 Teverow sent a letter to Motors memorializing the terms of the proposed lease and requesting Motors' written consent. Exhibit 2 to Plaintiff's Memo. Motors responded on December 1, 1997 with a signed letter revising and detailing the lease terms set forth in the November 25, 1997 letter. Exhibit 3 to Plaintiff's Memo.
On December 23, 1997 St. Angelo through his attorney Henry Swan expressed his concerns about the identity of the prospective tenant.[3] Exhibit 4 to Plaintiff's Memo.
In a letter dated January 26, 1998 written by Developer and sent to Joe Oertel[4] (Oertel) of CVS, Developer indicated that he had "negotiated a long term lease" with Motors for the Motors Property. Exhibit 6 to Plaintiff's Memo.
On February 28, 1998 Developer wrote a letter to Oertel stating to him: "There is no plan review in Barrington. We meet all the criteria from a zoning aspect and have room for some greenery". Exhibit 6 to Plaintiff's Memo.
Prior to the execution of the lease Teverow told St. Angelo that CVS was the proposed tenant for the Motors Property. St. Angelo deposition, pp. 42.
On February 19, 1998 Motors and CDA entered into a lease[5] for the Motors Property with the understanding that the property would be leased in order to construct and operate a CVS Pharmacy on the property. The lease had several conditions written into it requiring the acquisition of "permits" as a condition precedent to "possession of the Premises". Part II Article (iv)(b) of the February 19, 1998 Lease. Part II, Article (iv)(b)[6] and (iv)(c)[7] are the provisions of the lease that directly address the issue of "permits". The lease contains no language governing the number of parking spaces required. Similarly, there is no language indicating a location requirement for the parking spaces. February 19, 1998 Lease.
In a letter dated February 20, 1998 Attorney Swan memorialized Motors' understanding that CVS would guarantee the lease. Exhibit 8 to Plaintiff's Memo.
After signing the lease CDA initiated the process to acquire the necessary zoning approval in order to open a CVS pharmacy on the Motors Property. Teverow indicated to Developer in a letter dated April 30, 1998 that after discussions with the Town Manager, the Building Inspector, and the Chairman of the Design Review Committee of the Planning Board, "[i]t appears that there is a significant permitting process to go through in Barrington, but it also appears that the project will ultimately receive the necessary approvals". Exhibit 12 to Plaintiff's Memo.
CDA filed an Application for Development Plan Review with the Town of Barrington on May 12, 1998.
On May 14, 1998 Oertel informed CDA that CVS had approved the Motors site for the construction and that the project may be referred to as Store #210-02. In that letter Oertel also indicated that he knew the letter would be given to Motors on the condition Motors not disclose CVS' commitment to the site until a time that CVS deemed appropriate.[8] Exhibit 14 to Plaintiff's Memo.
On May 18, 1998 Teverow forwarded a copy of Oertel's May 14, 1998 letter to Motors. In the communication attached to his letter Teverow referred to the letter as "formal approval" of the CVS store and indicated that CVS will guarantee the lease. Exhibit 15 to Plaintiff's Memo.
Up until this point Motors believed their proposal was the only one that CVS was supporting. St. Angelo deposition, pp. 53. CVS had been leasing a commercial space from ACP Center Associates/Paolino Properties[9] ("Paolino Property") in another part of town prior to their application with Motors. Plaintiff's Memo at 13. The building that housed the CVS located on the Paolino Property fell into disrepair and when CVS' lease with Paolino expired CVS demanded as a condition to a new lease that Paolino pay for the cost of reconstruction. Plaintiff's Memo at 13. When Paolino refused CVS decided not to renew the lease and began to look for a different location to construct their building. Plaintiff's Memo at 13. In an effort to retain CVS as tenants, Paolino offered to pay for the demolition and reconstruction costs. Plaintiffs Memo at 13. Unbeknownst to Motors, CVS had two proposals on parallel tracks and on September 11, 1998 Oertel wrote to the Town of Barrington Planning Board ("Planning Board") and declared that CVS had knowledge of and consented to a design and site review application submitted by Paolino for a CVS store. Exhibit 18 to Plaintiff's Memo.
Sometime after executing the lease and addendum with Motors the Defendants retained professional site design engineers and architects to complete plans and designs for the construction of the CVS Pharmacy on the Motors Property. The above-mentioned plans were submitted to the Town of Barrington Planning and Zoning Boards ("Zoning Board") for review. The Town of Barrington Technical Review Committee ("Review Committee") preliminarily approved the plans on September 16, 1998 and six days later on September 22, 1998 the Planning Board granted preliminary approval as well. Exhibits 16 and 17 to Plaintiff's Memo. CVS representatives attended the September 16, 1998 Review Committee and the September 22, 1998 Planning Board meeting. Plaintiff's Memo at 6. CVS representatives verbally expressed,[10]
their support for the application for the construction of a CVS Pharmacy at the Motors Property.[11] St. Angelo depo, pp. 53.
On October 14, 1998 CDA filed a document called an "Application for Special Use Permit Use or Dimensional Variance of the Zoning Ordinance". On this application they requested a special use permit for drive through service, a dimensional variance for parking with a front yard setback, a special use permit for a pharmacy located in zone B, and a special use permit for additional signage. After the application was filed with the Zoning Board, a hearing was scheduled for November 19, 1998. While the Motor application was pending the Paolino application was still continuing on a parallel track and on October 20, 1998 the Paolino application was approved. According to the deposition testimony of Oertel, CVS decided not to negotiate a sublease with CDA after Paolino obtained zoning approval on October 20, 1998. Pg 97-98 of Exhibit 19 to Plaintiff's Memo.
On November 19, 1998, Teverow obtained from the Zoning Board a continuance of the application until the next Zoning Board meeting Scheduled for December 17, 1998. Prior to the December 17, 1998 meeting but on the same day, the corporation 56 Associates, an entity apparently controlled by Paolino, filed an objection to CDA's zoning application citing the case Newton v.Zoning Board of Review of City of Warwick, 713 A.2d 239 (R.I. 1998).[12] Based on that objection counsel for Motors requested by letter, a continuance "in order to evaluate the memorandum of law and any related issues". Exhibit G toDefendants' Motion For Summary Judgment hereinafter referred to as Defendant's Motion. Subsequent to sending their first letter, counsel for Motors sent a second letter on the same day via facsimile to all counsel requesting that CDA go forward on its zoning board application.[13] When the next Zoning Board meeting was held on December 17, 1998 neither CDA nor CVS were in attendance.
After the December 17, 1998 meeting the application was not presented again and no further action with respect to the zoning request occurred. Permits did not issue. The February 19, 1999 Outside Government Permit Date[14] passed.
The case at bar was filed in 1999. During discovery the February 23, 1998 invoice submitted to Developer[15]
surfaced. According to the invoice produced, Teverow's fees "[f]or services rendered in connection with the [Motors Property] lease for the CVS project" were "due upon permitting of [the] CVS store in Barrington". Exhibit 20 to Plaintiff's Memo. In spite of the fact that the building permits were never obtained, on March 13, 2000 CVS wrote a $50,000 check payable to Teverow. Exhibit 21 to Plaintiff's Memo. The invoices produced by CVS in 2001 also indicate that Developer's corporation Lehigh Reality Associates was reimbursed $80,627.14 for expenses associated with the Motors Property and prior to the Motors deal Developer has been involved in at least four more development projects with CVS.
 Standard of Review
"Summary judgment is an extreme remedy that should be applied cautiously." Learner v. Ursillo, 765 A.2d 1212, 1216 (R.I. 2001) (citing Sjogren v. Metropolitan Property and CasualtyInsurance Co., 703 A.2d 608, 610 (R.I. 1997). Super. R. Civ. Proc. 56 empowers a trial justice, upon proper motion, to enter summary judgment in favor of the moving party if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Stone v. GreenHill Civic Ass'n, Inc., 786 A.2d 387, 389 (R.I. 2001);Buonnanno v. Colmar Belting Co., Inc., 733 A.2d 712, 715 (R.I. 1999); Textron, Inc. v. Aetna Casualty and Surety Co.,638 A.2d 537, 539 (R.I. 1994); Palmisciano v. BurrillvilleRacing Association, 603 A.2d 317, 320 (R.I. 1992); Steinberg v.State, 427 A.2d 338 (R.I. 1981); Ludwig v. Kowal, 419 A.2d 297
(R.I. 1980). Summary judgment should be granted "only if an examination of the admissible evidence, undertaken in the light most favorable to the nonmoving party, reveals no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Kiley v. Patterson, 763 A.2d 583, 585 (R.I. 2000) (quoting J.R.P. Associates v. Bess Eaton Donut Flour Co.,685 A.2d 285, 286 (R.I. 1996)); Super. Ct. R. Civ. P. Rule 56(c). When a trial justice is ruling on a motion for summary judgment, the only question before him or her is whether there is a genuine issue of material fact that must be resolved. Rotelli v.Catanzaro, 686 A.2d 91, 93 (R.I. 1996). The party opposing a motion for summary judgment may not rely upon mere allegations or denials in his or her pleadings. Small Business Loan Fund v.Loft, 734 A.2d 953, 955 (R.I. 1998) (citing Bourg v. BristolBoat Co., 705 A.2d 969, 971 (R.I. 1998)). Rather "[a] party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material fact and cannot rest on the allegations or denials in the pleadings or the conclusions or on legal opinions." MaceraBrothers of Cranston, Inc. v. Gelfuso Lachut, Inc.,740 A.2d 1262, 1264 (R.I. 1999) (citing Manning Auto Parts, Inc. v.Souza, 591 A.2d 34, 35 (R.I. 1991)). If the opposing party cannot establish the existence of a genuine issue of material fact, summary judgment must be granted. Grande v. Almac's,Inc., 623 A.2d 971, 972 (R.I. 1993).
 The Motors Property Lease
The long and complicated facts of this case essentially boil down to a dispute over the terms of a commercial lease and whether or not the Defendant is excused from performance consistent with the provisions thereof. I. It is the averment of the Defense that the Newton case which held that no zoning board may grant a dimensional variance in conjunction with a special-use permit made it impossible to obtain all of the permits by the necessary date thus voiding any obligation owed under the terms of the lease. 713 A.2d 239. II. The Plaintiff essentially argues that under the terms of the lease the Defendants owed an obligation of good faith in trying to procure the permits which obligation they failed to honor because they received a more attractive offer from a third party.
 I. The Defendant's Argument.
The Newton case involved a zoning dispute concerning a certain parcel of real estate which had on it an unoccupied and uninhabitable single-family residential structure which the owners wanted to demolish and replace with a two-and-a-half story brick multifamily dwelling. Id. at 240. The lot was zoned as office space so the owners submitted an application to the zoning board for a special-use permit allowing a residential structure.Id. at 240. They also applied for a dimensional variance from the requirements of minimum-lot area, side-lot line, rear-lot line, parking line, density, design, and landscaping. Id. at 240. Their application was approved over the objection of local property owners who eventually filed an appeal in Superior Court.Id. at 240. After an examination of the record this Court decided and the Supreme Court affirmed the decision that a special use permit may not be granted simultaneously with a dimensional variance.
The Motors Property is located in a Zone B. Under the applicable ordinance a special use permit is required for a pharmacy operation, for a drive through, and for the signage desired by CVS. They also required a dimensional variance for parking with a front yard setback. The plans called for both a dimensional variance and a special use permit, and the decision of Newton made the simultaneous acquisition of both improper. Thus under Part II Articles (iv)(b) and (iv)(c) the Defendants claim they had no obligation to take possession of the premises because the "permits" were not acquired before The Outside Government Permits Date which was set at February 19, 1999.
The Court sees the definition of the word "permit" under the terms of the lease as a disputed material fact. The Defense continually referred to them as "necessary permits" throughout their motion, however when one looks to the language of the lease the word is conspicuously absent. It is argued by the Plaintiff that a dimensional variance was never actually necessary for the construction of a CVS on the Motors Property. The lease contains no language referring to how many parking spaces were required nor does it contain language indicating where the parking lots were to be located. If fact, a letter between Developer and Oertel indicates that the project met "all the criteria from a zoning aspect and [had] room for some greenery". Exhibit 6 to Plaintiff's Memo. Whether or not CVS Pharmacy could have been built on the Motors Property while still remaining within the strict requirements of the "standard store design" is a material fact in dispute. Exhibit D to Defendant's Motion.
Regardless of whether or not there were alternative designs available that did not require both a dimensional variance and a special use permit, the "permits" were not acquired by the February 19, 1999 deadline. Furthermore, the term "standard store design of necessity" does not have a legal meaning and therefore presents an unresolved factual issue of consequence.
 II. The Plaintiff's Argument.
It is the position of the Plaintiff that the "permits" would have been acquired but for the fact that the Defendants did not put forth a good faith effort to procure them. Thus they should be liable under Part II Article (iv)(c) for breaching the lease agreement.
Assuming that the Newton case is not an absolute bar to the permitting process the fact that the permits were not obtained by the February 19, 1999 deadline would trigger the drop-dead provision of the lease and vitiate any obligations arising under the agreement. Id. However, pursuant to Part II Article (iv)(c) of the lease agreement "Tenant may exercise the right of termination described in this subdivision only if Tenant has diligently pursued, in good faith, the acquisition of said Permits, and has failed to acquire same for reasons beyond its reasonable control". Part II Article (iv)(c) of the February 19, 1998 Lease (emphasis added).
Although it is not binding law in this situation, the version of the Uniform Commercial Code adopted by Rhode Island provides a helpful definition for the term "good faith". It provides "`Good faith' means honesty in fact in the conduct or transaction concerned". R.I. Gen. Laws § 6A-1-201.
Rhode Island does not have a large body of case law concerning the issues involved in the case at bar. In other jurisdictions courts have held that a finding of whether or not parties have acted in good faith is largly a factual question. See Tepedinov. City of Long Beach, 640 N.Y.S.2d 591 (1996) (Whether aparty to a contract has failed to act in good faith is generallya fact question for jury); Habetz v. Condon, 618 A.2d 501
(Conn. 1992) (It is the burden of the party asserting lack ofgood faith in contract disputes to establish its existence, andwhether the burden has been satisfied is a question of fact);Phillipe v. Thomas, 489 A.2d 1056 (Conn. App. 1985) (Whether aplaintiff's actions constituted reasonable efforts to satisfy acontractual condition is a factual determination for the trialcourt); Fernandez v. Vazquez, 397 So.2d 1171 (1981) (Whetherlandlord acted in good faith and cooperated with the conditionsof a contract is to be determined by a jury according to thefacts of the case); Burke v. General Outdoor Advertising Co.,168 A. 334 (Pa. Super. 1933) (In an action for rent for use of aroof under a lease providing that if authorities did not permitsigns on the roof, the lease could be cancelled, whether thelessee applied for a permit in good faith and was refused was aquestion left for the jury).
There is serious cause for concern in the Court's opinion based on the material facts of this case about whether or not the Defendants acted in good faith. If the facts are viewed in the light most favorable to the Plaintiff then it would appear that the Defendants supported the Paolino CVS application without the knowledge of Motors, and once that proposal was approved they simply backed out of their signed agreement. In the light most favorable to the Plaintiff it appears that sometime after October 20, 1998 CVS and CDA made a deal in which CVS would pay Teverow $50,000 and reimburse Developer $80,627.14 in exchange for their promise not to file a civil action against them. If viewed in the light most favorable to the Plaintiff it might appear that CVS agreed to rent from Paolino in order to save the $750,000 or more that it would have cost them to honor their contract with Motors, and in order to make it all work Paolino needed only to hire lawyers to file an objection based on Newton with the Zoning Board.[16] Id.
If in fact the Defendants did not act in good faith in their attempt to procure the permits for the Motors Property, then pursuant to Part II Article (iv)(c) of the lease they would have no right to termination. Indeed, depending on certain facts to be determined at trial it might be there was no need to, (with a slight tweaking of CVS's plans and specs), even have applied for any dimensional variance.
 Conclusion
This Court will grant a motion for summary judgment after an examination of the admissible evidence, undertaken in the light most favorable to the non moving party shows there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. A review of the arguments advanced by counsel and of all other materials properly before this Court reveals that there are genuine issues of material fact that preclude the grant of summary judgment in the instant matter.
Counsel for plaintiff shall submit an appropriate order for entry.
[1] Developer's initial intentions were to purchase the property however when it became clear that Motors did not want to sell the parties began to negotiate a lease agreement.
[2] Page 54 of Exhibit 1 to Plaintiff's Memorandum of Law inSupport of Plaintiff's Opposition to Defendants' Motion forSummary Judgment hereinafter referred to as Plaintiff's Memo.
[3] Motors wanted some indication that the prospective tenant would have "viability. . . . as a long term tenant" and that the tenant would be compatible with existing leaseholders. Exhibit 4 to Plaintiff's Memo.
[4] Mr. Oertel is Director of Real Estate for CVS according to the letterhead used in his May 14, 1998 letter to Teverow.
[5] On or about March 3, 1998 Motors and CDA executed an addendum to the lease adding an additional parcel to the February 19, 1998 lease.
[6] Part II Article (iv)(b) provides: "Notwithstanding anything to the contrary in this Lease, in no event shall the Tenant be obligated to accept possession of the Premises until all `permits' have been issued to Tenant for Tenant to operate its desired business at the Premises, unless such `permits' are waived by Tenant".
[7] Part II Article (iv)(c) provides: "Unless on or before the Outside Government Permits Date, Tenant shall have obtained its Permits, and all appeal periods with respect thereto have expired with no appeals having been taken, at any time thereafter (but prior to the acquisition by Tenant of said Permits and the expiration of all appeal periods with respect thereto, with no appeals having been taken), Landlord or Tenant may terminate this Lease upon 30 days' written notice to the other party; and this Lease will so terminate unless, prior to the expiration of said 30 days, Tenant shall obtain such Permits and such appeal periods shall have expired with no appeals having been taken. Tenant mayexercise the right of termination described in this subdivisiononly if Tenant has diligently pursued, in good faith, theacquisition of said Permits, and has failed to acquire same forreasons beyond its reasonable control" (emphasis added).
[8] There were actually several drafts sent back and forth between Teverow and Oertel.
[9] The commercial property is in effect owned by Mr. Paolino, a well-known developer who owns significant property throughout the Barrington area. Mr. Paolino, ACP Center Associates and Paolino Properties will be collectively referred to hereinafter as "Paolino".
[10] According to St. Angelo CVS indicated "[t]hat we were the only project that they had going on in Barrington". St. Angelo depo, pp. 53.
[11] According to St. Angelo's deposition at page 53 he does not remember the names of the CVS representatives who were in attendance at the meeting with the exception of Oertel.
[12] The opinion was rendered on June 12, 1998.
[13] The minutes from the December 17, 1998 Zoning Board meeting indicate that Attorney Maglio was present representing St. Angelo Reality Co.
[14] Part 1 Article 12 provides "Outside Government Permits Date: One Year from the Date of this Lease (See Article 2 of Part II)".
[15] This document was produced on December 19, 2001.
[16] The fact that 55 Associates did not file an objection to the construction of a Brooks Pharmacy on the Motors Property further supports the Plaintiff's theory.