Americo C. BUONANNO, III

v.

COLMAR BELTING CO., INC. et al.

No. 98–21–Appeal.

Supreme Court of Rhode Island.

July 12, 1999.

Howard B. Klein, Donna M. DiDonato, Providence, for Plaintiff.

John Bruno, Thomas R. McKeon, Portland, ME, Lee M. Walker, Newton, IA, Timothy J. Robenhymer, James A. Ruggieri, Providence, for Defendant, Colmar Belting Co.

Harrison Richardson, Portland, ME, for Defendant, Emerson Power Transmission.

J. William Harsch, for Defendant, Louis L. Vinagro.

Joseph A. Kelly, C. Russell Bengtson, Providence, for defendants, Kenneth Butler et al.

Present WEISBERGER, C.J., LEDERBERG, FLANDERS, BOURCIER, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

The plaintiff, Americo C. Buonanno, III (Buonanno), brought this products liability case on theories of strict liability and negligence, for injuries received when his arm was crushed in the nip point[1] of a conveyor-belt system. In his complaint, Buonanno alleged that the conveyor-belt system and the wing pulley were defectively designed by the defendants, Emerson Power Transmission Corporation (EPT) and Colmar Belting Company, Inc. (Colmar), and that both EPT and Colmar failed to warn of the dangerous condition of the wing pulley. The trial justice granted summary judgment for EPT and Colmar on the theory of product liability and on the issue of negligence. Buonanno now appeals this judgment.

### Facts and Procedural History

On September 30, 1993, Buonanno was employed by New England Ecological Development, Inc. (NEED), a recycling transfer station located in Johnston, Rhode Island. The plant consisted of several conveyor belts used to transport demolition materials, and several catwalks on which employees would stand, sort through demolition material, and drop the debris onto the floor located below the conveyor belts. Although Buonanno had only been working at the plant for approximately two and one-half months, he held the position of "supervisor." At the time of his injury, Buonanno was working at NEED in his supervisory position when he observed that one of the conveyor belts was running off track. In an effort to identify the source of the problem, Buonanno turned off the machine and climbed onto a catwalk to determine if the belt was obstructed. While he remained on the catwalk, someone restarted the machine, and Buonanno began clearing a path free from debris for the individual who would eventually repair the belt. He soon lost his balance and began to fall when his arm was tragically pulled into the "nip point" of the conveyor system. As a result of this accident, his dominant right arm was severely crushed and subsequently amputated at the elbow.

1. A "nip point" is created where the conveyor belt moves over the stationary portion of the conveyor-belt system, or the "wing pulley." The wing pulley prevents waste materials from getting caught between the roller and the belt.

Buonanno also suffers emotionally and has been unable to return to the work force since the date of this accident.

Colmar is a distributor of conveyor-belt system parts which apparently sold most, if not all, of the component parts of the conveyor system to NEED. Colmar, however, maintains that it was not in the business of designing or in any way building conveyor systems. The record reveals that the conveyor belt that caused Buonanno's injury was purchased and constructed to transport rubbish inside the NEED plant. Once this purpose was determined, a representative of NEED contacted John Brunaccini (Brunaccini), the president of Colmar, and informed him of the speed at which NEED intended to run the conveyor, the width of the pulley, and the type of motor required.[2] The wing pulley, which is a component part of the nip point of the conveyor belt system, was manufactured by EPT and sold to NEED by Colmar. It is significant that Colmar neither sold nor recommended the use of a protective shield (hereinafter shield or guard) to guard the nip point. Moreover, Colmar did not sell any type of guard for these pulleys because it maintains that such a guard is usually custom-made by a welder who then installs it on the finished product. Kenneth Butler (Butler)[3] was the welder who was hired to actually construct the conveyor-belt apparatus after the owner of NEED contacted him with the conceptual plan of the system. NEED's final, integrated conveyor-belt system contained no shield over the nip point area, notwithstanding the fact that an unguarded nip point was generally known to be a hazardous aspect of the system. Apparently, on September 3, 1993, approximately three weeks prior to this incident, an inspector from the United States Occupational Safety and Health Administration (OSHA) examined the NEED facility and indicated that the unguarded nip point presented a danger to employees and that OSHA had issued a warning that guards should be installed at all nip points.[4] While Buonanno argues that it was the absence of the guard and the failure to warn of the danger that rendered the product defective, both EPT and Colmar maintain that due to the unique nature of the conveyor system, it was not feasible to provide a shield with the wing pulley, since shields were typically custom-made by the welder who constructed the conveyor system.

Buonanno filed an amended complaint against EPT and Colmar, which alleged strict liability and negligence with respect to the design of the wing pulley and failure to warn of its dangerous nature. EPT filed a motion for summary judgment setting forth the following ground: as a manufacturer of a component part, EPT had no duty to insure the proper design of the final integrated product. Subsequently, Colmar joined in EPT's motion for summary judgment and in addition, stated that Colmar did not manufacture any component part, nor did it design any aspect of the conveyor belt. During the summary judgment hearing held on November 14, 1997, EPT again argued that as a manufacturer of a component part, EPT had no duty to warn against any injuries caused by the final integrated product since it had no involvement with the design of the entire system. Also during this hearing, Colmar indicated that it "would have the same defenses as [EPT]," and argued that Colmar had no involvement in the design or manufacture of the pulley and in fact, had never even handled the product, since the wing pulley was shipped directly from EPT to NEED. In other words, EPT and Colmar maintained that they had "no duty" as a component part seller, but

---

**2.** Brunaccini could not remember exactly which employee contacted him from NEED; to the best of his recollection it was Bill Perry.

**3.** Butler is also a defendant in this case, however, he is not a party to this appeal.

**4.** According to Butler, although OSHA required guards to be installed, NEED had not installed them as of the date of Buonanno's injury.

failed to challenge the existence of a defect. Further, Buonanno responded to the motion for summary judgment by arguing in favor of the existence of a duty on the part of EPT and Colmar. Although not raised by either defendant as grounds for summary judgment, Buonanno also presented record evidence that there was a safer alternative design of the wing pulley that could have reduced the foreseeable risk of harm posed by this product, thus rendering it less likely that a user would become caught in the pulleys spindles and drawn into the nip point.

The trial justice failed to address the question of the manufacturer's duty and the issue of an alternative safer design. He granted summary judgment on behalf of EPT and Colmar and noted that the case law presented by Colmar and EPT supported the argument that a manufacturer or distributor of a component part is not liable for injury caused by the final integrated product. *Moor v. Iowa Manufacturing Co.*, 320 N.W.2d 927 (S.D.1982). In making his determination, the trial justice indicated that considering the holding in *Moor*, Buonanno was required to produce competent evidence that a defect existed in the wing pulley at the time it left the control of the manufacturer, which rendered the product unreasonably unsafe. *See id.* at 928. The trial justice ultimately found that Buonanno had failed to demonstrate the existence of a defect at the time the wing pulley left EPT's manufacturing plant and overlooked the question of a defect based upon the availability of a safer alternative design. Moreover, regarding the negligence claim, he found that Buonanno failed to prove that EPT and Colmar owed a duty to design the wing pulley "such that it would not cause the injury that occurred to the plaintiff." He then granted both Colmar's and EPT's motion for summary judgment and Buonanno appealed.

▪▪▪ "When considering an appeal of a grant of summary judgment, this [C]ourt employs the same standard and rules that the trial justice applied in evaluating the motion." *Textron, Inc. v. Aetna Casualty and Surety Co.*, 638 A.2d 537, 539 (R.I. 1994); *see also Holliston Mills, Inc. v. Citizens Trust Co.*, 604 A.2d 331, 334 (R.I. 1992). "We examine the pleadings and affidavits in the light most favorable to the nonmoving party to decide whether an issue of material fact exist[s] and whether the moving party [is] entitled to summary judgment as a matter of law." *Textron, Inc.*, 638 A.2d at 539. Moreover, " '[s]ummary judgment is proper when there is no ambiguity as a matter of law.' " *Id.* It is the burden of the party opposing a motion for summary judgment to assert facts that " 'raise a genuine issue to be resolved.' " *Id.*

## Analysis

When ruling on defendants' motions for summary judgment, the trial justice focused predominantly on the question of the existence of a defect and found that "there has been no evidence which has been offered by the plaintiff to establish that, at the time that the wing pulley left Emerson's manufacturing plant, that it was, indeed, defective." On the issue of negligence, the trial justice refused to conclude that "the plaintiff has proven that these defendants owed a duty to design the matter such that it would not cause the injury that occurred to the plaintiff." Therefore, he granted "the motions for summary judgment by the [d]efendants Emerson and Colmar on the issue of negligence." At the time of the hearing, however, the trial justice did not consider the recently enacted Restatement (Third) *Torts* which addresses the very issue of component part liability. *See* Restatement (Third) *Torts* § 5 (1998). Since the advent of the recently published Restatement, we have not had the occasion to address the liability of the manufacturer of a component part of a defective final product, and we take this opportunity to do so now. Upon considering the Restatement, we conclude that this case turns not on a preliminary

determination of the existence of a defect, but rather on whether EPT or Colmar, as the manufacturer and distributor of a component part, has a duty relative to the integrated machine. Section 5 of the Restatement entitled "Liability of Commercial Seller or Distributor of Product Components for Harm Caused by Products Into Which Components Are Integrated," reads as follows:

> "One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> (a) the component *is defective in itself,* as defined in this Chapter, and the defect causes the harm; or
>
> (b) (1) the seller or distributor of the component *substantially participates in the integration of the component into the design of the product* ; and
>
> (2) the integration of the component causes the product to be defective, as defined in this Chapter; and
>
> (3) the defect in the product causes the harm." Restatement (Third) *Torts* § 5 at 130 (emphases added).

As a general rule, component manufacturers or sellers should not be liable under this section unless the component part itself was defective when it left the manufacturer. Restatement (Third) *Torts* § 5 cmt. a. Furthermore, a component part supplier should not be required to act as an insurer for any and all accidents that may arise after that component part leaves the supplier's hands. *See Crossfield v. Quality Control Equipment Co.,* 1 F.3d 701, 704 (8th Cir.1993). *Crossfield* stands for the proposition that the primary duty is owed by the designer of the machine, not the supplier of the component parts. *See id.* However, liability can be extended to a component part manufacturer and/or

seller in certain situations. *Union Supply Co. v. Pust,* 196 Colo. 162, 583 P.2d 276, 278 (1978). By its very terms, the Restatement provides an exception to the general rule that a seller or distributor is subject to liability when "the seller or distributor of the component *substantially participates* in the integration of the component into the design of the product." Restatement (Third) *Torts* § 5(b)(1)· (emphasis added).

As a preliminary matter, we summarily reject Colmar's argument that because it did not manufacture the wing pulley but merely sold it to NEED, it is immune from liability. A simple review of the Restatement indicates otherwise.[5] Moreover, applying similar reasoning, we reject EPT's and Colmar's argument that because they are merely manufacturers or distributors of component parts, they are immune from liability. We adopt the Restatement's conclusion that the manufacturer or seller of a component part may be liable to the ultimate user, particularly when it has substantially participated in the integration of the component into the design of the final product. Restatement (Third) *Torts* § 5.

The record contains the following facts relevant to the issue of "substantial participation" as an element of the Restatement: Colmar supplied the component parts of the conveyor belt system to NEED. The system was constructed by Butler, a welding contractor retained by NEED, who indicated that he "would call [Colmar] and tell them * * * how long the conveyor would be [that] I would be building, * * * how fast I wanted it to go, and [a representative of Colmar] would come up with a formula" as to what was needed to construct the conveyor. Brunaccini, a Colmar sale representative, maintained that NEED "knew what [component parts] they wanted," but it was Colmar's option

---

5. Restatement (Third) *Torts* § 5 (1998) imposes liability on those "engaged in the business of selling or otherwise distributing product components" and contains no prerequisite that the defendant manufactured the product.

as to which manufacturers Colmar would utilize. In addition, the trial justice observed that Colmar supplied the component parts to NEED, and that Colmar was the "one who selected the particular product[s]." Moreover, there is a suggestion in the record that this particular conveyor belt is but one of a series of belts developed through the collaborative efforts of NEED and Colmar over a period of time. Accordingly, a fact finder may conclude, from the nature of this relationship, that Colmar participated in the design of this product. In conclusion, these facts, albeit from a limited record, may create a reasonable inference that Colmar "substantially participated" in the design of the conveyor belt system, thereby creating a genuine issue of material fact. On the contrary, however, there is not a scintilla of evidence to suggest that EPT had any relationship with NEED, nor is there evidence that EPT participated in the construction or design of the conveyor belt system. In addition, we decline to adopt the position urged by Buonanno that a genuine issue of material fact may exist on the question of whether the wing pulley was defective by virtue of EPT's failure to include a warning when it shipped the pulley to NEED. The Restatement imposes liability on a component part manufacturer only if "the component is defective *in itself,*" which is to be determined "at the time of sale or distribution," Restatement (Third) *Torts* §§ 2, 5 (emphasis added), rather than the point at which it is integrated with other component parts.

Here, it is undisputed that the nip point is created only when the belt meets the wing pulley after the entire conveyor belt system is assembled. There was no evidence presented to suggest that a single, isolated wing pulley presents a danger. Therefore, the wing pulley is not defective "in itself" or "at the time of sale or distribution," but only creates the potential for injury when integrated into the conveyor-belt system.

In the alternative, the Restatement also provides that a manufacturer of a component part may be subject to liability if the manufacturer "substantially participates in the integration" of an ultimately defective product. Restatement (Third) *Torts* § 5(b)(1). As indicated above, we determined that there is no evidence in the record to suggest that EPT participated in the integration of the wing pulley into the conveyor belt system, therefore EPT is not subject to liability under this theory.

However, we are persuaded that a genuine issue of material fact may exist with respect to whether the pulley's design was defective as a result of EPT's failure to produce a reasonable alternative design that may have reduced or avoided the foreseeable risk of harm suffered by Buonanno, which would render the product defective "in itself" and "at the time of sale or distribution." Specifically, the Restatement (Third) *Torts* § 2(b) provides that a product is defective when:

"the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe."

Although this issue was not actually litigated by the parties, the record is clear that Buonanno produced evidence that a safer design of the pulley was available. Specifically, in his deposition, John Brunaccini, Colmar's president, testified that EPT manufactured (for other customers on a "made-to-order-basis"), a wing pulley that had steel welded around the circumference of the wings, and that it manufactured this design at the same time that it manufactured the pulley in question. Brunaccini also indicated that there was a design known as a "spiral wing pulley" which had circular pieces wound around the pulley that would cover "the whole thing." Accordingly, we are satisfied that a genuine issue of material fact exists as to

whether this was a reasonable alternative design within the meaning of the Restatement. If so, the question remains as to whether the foreseeable risks of harm posed to plaintiff could have been reduced or avoided had the alternative design been available and offered to NEED. We recognize that it may not have been economically feasible for EPT to manufacture a wing pulley with this additional guarding for this particular use and such a factor would bear significantly upon the reasonableness of this alternative design. These determinations, however, are to be determined by a fact finder and are not suitable for summary judgment.

WEISBERGER, Chief Justice *noting that all members of the Court concur with Justice Goldberg's opinion vacating the summary judgment in respect to Colmar Belting Co., Inc. but delivering a majority opinion affirming the summary judgment entered in favor of EPT. In this opinion relating to EPT,* Chief Justice WEISBERGER *is joined by* Justices LEDERBERG and BOURCIER.

■ We are of the opinion that EPT was entitled to summary judgment. We agree with Justice Goldberg's candid statement that "there is not a scintilla of evidence to suggest that EPT had any relationship with [New England Ecological Development Company] (NEED), nor that EPT participated in the construction or design of the conveyor belt system.". She then observed that she declined to adopt a position that a genuine issue of material fact may exist on the question of whether the wing pulley was defective by virtue of EPT's failure to include a warning when it shipped the pulley to the plaintiff. We agree with these holdings contained in Justice Goldberg's opinion, and, therefore, we note that the wing pulley was not unreasonably dangerous when shipped from EPT's manufacturing facility. It only became dangerous when incorporated into the conveyor belt system. At that time, a nip point was created into which the arm of the plaintiff was drawn when he lost his balance while clearing a path free from debris on the conveyor belt.

When it left the manufacturer the pulley was a harmless component that could have been used in the assembly and construction of a conveyor belt system with appropriate precautions to safeguard the nip point. EPT should not be chargeable with anticipating that NEED or any other sophisticated assembler-purchaser would utilize this pulley in such a fashion as to create a hazardous nip point. As pointed out by Kenneth Butler, NEED's welder in his deposition, it was the responsibility of Vinagro (NEED's principal officer) or someone working for him to provide appropriate guards in compliance with OSHA requirements. The wings on the pulley were open-ended and were designed to allow debris to fall out of the pulley. There was no evidence presented by deposition, affidavit, or otherwise, that this pulley was in any way dangerous until combined with the conveyor belt to create an unguarded nip point.

We are of the opinion that in the absence of any such evidence, it would be speculative to infer that EPT might have formulated an alternative design that "may have reduced or avoided the foreseeable risk of harm" to the plaintiff. We regard this speculation as insufficient to form the basis for a genuine issue of material fact. We agree that this Court must examine the pleadings and affidavits in the light most favorable to the nonmoving party to decide whether a genuine issue of material fact exists. *Textron, Inc. v. Aetna Casualty and Surety Co.,* 638 A.2d 537, 539 (R.I. 1994). With this rule we are all in complete agreement. To speculate upon an alternative design that might have been able to operate in such a way as to reduce the harm to the plaintiff, when the pulley was incorporated into the conveyor-belt system would be a violation of the procedural rule which we all agree must be followed when reviewing the grant of a motion for summary judgment. It is the

burden of the plaintiff to raise a genuine issue of material fact. *Ludwig v. Kowal,* 419 A.2d 297, 301–02 (R.I.1980). As Justice Goldberg candidly admits, this issue was not actually litigated by the parties. She did cite the deposition of John Brunaccini, an employee of Colmar, that EPT manufactured for other customers on a "made-to-order-basis" a wing pulley that had steel welded around the circumference of the wings. Brunaccini also indicated that there was a design known as a spiral wing pulley that had circular pieces within the wing pulley that would cover the whole component.

■ We are unwilling to place upon a manufacturer under the doctrine of strict liability the obligation of manufacturing a component part, as ordered by a sophisticated purchaser, containing safeguards that have not been ordered by the purchaser and are unnecessary to safeguard the ultimate assembly unless a dangerous condition is created by the purchaser-assembler itself.

The central requirement of § 5 of the Restatement (Third) Torts (1998) is that the manufacturer or seller of a component part is subject to liability for harm to persons or property only if the component is defective in itself or: (1) if the seller or distributor of the component substantially participates in the integration of the component into the design of the product and; (2) the integration of the component causes the product to be defective.

Since it is undisputed that this manufacturer did not participate in the integration of the component into the design of the product, and further, there is no genuine dispute that the product was not defective when shipped by EPT, the alternative design concept should not create liability when it would only become relevant in the event that NEED failed to guard the nip point created by the ultimate design. As Justice Goldberg wisely points out "there was no evidence presented to suggest that a single, isolated wing pulley presents a danger. Therefore, the wing pulley is not defective 'in itself' or 'at the time of sale or distribution' but only creates the potential for injury when integrated into the conveyor-belt system."

Under these circumstances and in light of the terms of the Restatement (Third) *Torts* § 5, we believe there is no basis to conclude that there was any issue of material fact which could justify an alternative design theory.

■ Addressing the concurring opinion of Justice Flanders which contends that there was a duty to warn, a concept rejected by both the majority and Justice Goldberg, we believe that no such duty to warn is required by our prior case law or by the Restatement. A component part supplier such as EPT should not be required to act as insurer for any and all accidents that may arise after that component part leaves the supplier's hands. *Crossfield v. Quality Control Equipment Co.,* 1 F.3d 701, 705 (8th Cir.1993). We hold that this case stands for the proposition that the primary duty is owed by the designer of the assembled machine and not the supplier of the component parts in the absence of substantial participation in the integration of the component into the design of the product.

■ Since EPT cannot and should not be responsible for the anticipation of every conceivable design that may be utilized by a sophisticated assembler of a conveyor belt system, it should have no duty to warn, particularly in respect to conditions that are only created after the final product is assembled. *See Monex, Inc. v. Anthony A. Nunes, Inc.,* 576 A.2d 1206, 1209 (R.I.1990).

## Conclusion

Consequently, for the reasons set forth in Justice Goldberg's opinion, the plaintiff's appeal is sustained in respect to the granting of summary judgment in favor of Colmar Belting Co., Inc. Summary judgment in favor of Colmar is vacated. The plain-

tiff's appeal is denied in respect to the granting of summary judgment in favor of EPT. The summary judgment in favor of EPT is hereby affirmed. The papers in the case may be remanded to the Superior Court for further proceedings in respect to the plaintiff's complaint against Colmar Belting Co., Inc.

FLANDERS, Justice, concurring in part and dissenting in part.

I concur with respect to the Court's reversal of the summary judgment concerning Colmar, but I respectfully dissent from the majority's opinion affirming the summary judgment in favor of EPT for the same reasons indicated in Justice Goldberg's opinion, albeit I do so, in part, on somewhat different and additional grounds. At oral argument before us, EPT's counsel conceded that, to EPT's knowledge, every turn clean wing pulley that it manufactured eventually was integrated into a conveyor-belt system that would include one or more dangerous nip points. Moreover, apparently the parties do not dispute that without a guard or protective device of some sort—or at least a warning—these nip points in conveyor-belt systems expose users to an unreasonable risk of suffering a debilitating injury of the kind that the plaintiff sustained in this case. Thus, this is not a situation in which some uses of the component part result in a non-dangerous integration, whereas others—like the integration into a conveyor-belt system—result in an unreasonable risk of danger to foreseeable users. Rather, as a practical matter, the only known use for EPT's pulleys (that is, integration into conveyor-belt systems) results in nip points that, without guards or warnings, pose unreasonable risks of harm to foreseeable users. Under these circumstances, I would treat the component pulleys as if they were defective in and of themselves because their only foreseeable use creates an unreasonably dangerous integration.

Under the Restatement (Third) *Torts* (1998), a component part is defective if, among other things, it contains:

"inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe." *Id.* § 2(c) at 14.

Here, EPT claimed in its summary-judgment motion that it typically provides purchasers of this type of pulley with three different warnings indicating that they should install guarding. First, it argued that the catalog of the Van Gorp Drives and Component Division of EPT provided a disclaimer:

"SAFETY DEVICES—The products are provided with only those safety guards identified herein. It is the responsibility of the purchaser to furnish appropriate guards for machinery parts in compliance with OSHA standards, as well as any other safety devices desired by the purchaser and/or required by law."

EPT also asserted that Colmar and NEED had a copy of this catalog. Second, EPT claimed that it typically includes a warning relative to the nip-point risk in the boxes that it uses to pack its bushings, which are sub-components of the wing pulley. The warning reads: "CAUTION: Install guards around all drives in accordance with local and national codes." Third, EPT maintained that all pulleys that it sold in 1993 were affixed with a yellow sticker providing a warning. The warning stated:

"SAFETY DEVICES. THE PRODUCTS ARE PROVIDED WITH ONLY THOSE SAFETY DEVICES IDENTIFIED HEREIN. IT IS THE RE-

SPONSIBILITY OF THE PURCHASER TO FURNISH APPROPRIATE GUARDS FOR MACHINERY PARTS IN COMPLIANCE WITH OSHA STANDARDS, AS WELL AS ANY OTHER SAFETY DEVICES DESIRED BY PURCHASER AND/OR REQUIRED BY LAW."

The parties here dispute (1) whether the boxes containing the warnings were ever delivered when EPT shipped the wing pulleys to NEED for integration into its conveyor-belt system and (2) whether EPT attached any sticker to the pulleys used in NEED's conveyor-belt system. In any event, the fact that EPT went to the trouble of printing a warning that was included in at least some of its packing boxes and affixed to certain of its pulleys represents some indication that it was well aware of the unreasonably dangerous condition created by the inevitable integration of its wing pulleys into conveyor-belt systems like the one assembled for NEED. Moreover, because the duty to warn runs to foreseeable users of the product and not just to buyers, warnings in boxes that are discarded after assembly may not be sufficient to alert users like Buonanno to the danger.

Accordingly, it seems to me that a genuine issue of material fact exists over whether the wing pulleys were defective in and of themselves by virtue of EPT's alleged failure to include some type of warning(s) with and on the pulleys themselves concerning the dangerous nip-point condition that would result from their inevitable integration into NEED's conveyor-belt system. *See Parkins v. Van Doren Sales, Inc.,* 45 Wash.App. 19, 724 P.2d 389 (1986) (holding that summary judgment was improper in a case involving an injured plaintiff's strict-liability failure-to-warn claim against the manufacturer of component parts which, when integrated into a conveyor-belt system, invariably created nip points and which contained no warning labels, decals, signs, or other instructions relative to these nip points). Such a warning or warnings most likely would have alerted purchasers of the pulleys and/or users of the system that, without a guard around the nip point, use of the system could prove unreasonably dangerous. Viewing the evidence in a light most favorable to the nonmoving party, Buonanno may not have chosen to clear the debris away from the area near the nip point, at least while the system was in operation, if a warning on the pulley had alerted him to the danger of doing so without a safety guard on the nip point.

Accordingly, with respect to EPT, I respectfully dissent from the Court's decision to affirm the grant of the summary judgment. Rather, I would remand this case to the Superior Court for further proceedings concerning whether EPT's wing pulley was defective because it failed to include some sort of a feasible guard device like the one used in its other pulleys. Moreover, I also would remand for further proceedings concerning whether the pulley was defective because of the failure to include some type of warning on the pulley itself that would alert users to the nip-point danger. Finally, I agree with and therefore join my colleagues' decision to reverse the summary judgment concerning Colmar.