Opinion issued July 26, 2007







 






In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00128-CV






RANGER CONVEYING & SUPPLY COMPANY, Appellant


V.


DARYL DAVIS, Appellee






On Appeal from the 61st District Court

Harris County, Texas

Trial Court Cause No. 2001-57214






OPINION ON REHEARING

 We issued an opinion in this case on May 3, 2007. Appellee, Daryl Davis, 
moved for a rehearing. After receiving a response from appellant Ranger Conveying
& Supply Company ("Ranger"), we grant rehearing, withdraw our opinion, vacate our
judgment of May 3, 2007, and issue this opinion in its stead.

 Ranger appeals a judgment, entered in accordance with the jury's verdict, in
favor of Davis, in the amount of $1.6 million for injuries Davis received when a 580-pound bale of paper pulp fell from a clamp truck owned by Davis's employer, the
Pasadena Paper Company ("Pasadena Paper"). The falling bale hit Davis's arm and
pinned his hand to a spike on a conveyor that was manufactured by Ranger. After
Davis presented his case-in-chief, Ranger moved for an instructed verdict, which the
court denied. The jury found Ranger liable for a marketing defect. Ranger moved for
a new trial and for judgment notwithstanding the verdict (JNOV), but the trial court
denied the motions.

 In its third issue, Ranger contends that the trial court erred by denying
Ranger's motion for JNOV because "Ranger did not owe or breach any duty to
Davis" or owe a duty to Pasadena Paper "to formulate facility policies." We conclude
that Ranger had no duty to warn about the interface area of Pasadena Paper's clamp
truck and Ranger's conveyor because (1) the jury determined that there was no design
defect in the conveyor itself, which was what Ranger was hired to design, produce,
and install, and (2) the interface area was part of the larger system that included the
loading of bales with the use of the clamp truck, and Ranger was not hired to and did
not participate in the integration of the conveyor into the larger system. We reverse
and render a take nothing judgment in favor of Ranger. (1)

Background

 Davis worked for Pasadena Paper for 12 years, and had worked in the
hydropulper department for several months. The purpose of the hydropulper
department is to convert large bales of raw material into pliant material that can be
pressed into sheets of paper. Before the installation of the conveyors manufactured
by Ranger, Pasadena Paper employees lifted bales one at a time into the hydropulper
machine after cutting the wires from the bales. 

 To increase productivity by allowing more bales to be processed by the
hydropulper, Pasadena Paper contracted with Ranger to design, manufacture, build,
and install conveyors. The purchase order called for "two [20-inch] spiked chain
dewiring conveyors, with support, drive, motor starter, safety stop cable on both
side[s], each designed to support 8 bales at 580 [pounds per] bale." In December
1998, Ranger installed the conveyor that was involved in this incident, a 20- to 25-foot-long conveyor that moved a bale from one end, after the bale was placed onto
the conveyor by a clamp truck, to the other end, where the bale was deposited into the
hydropulper. The design of the Ranger conveyor included spikes to hold the bale up
and away from the conveyor's surface so that employees could more easily cut and
remove the wire that surrounded the bale before it entered the hydropulper. Each bale
was large, weighing approximately 580 pounds, and measuring 32 inches wide by 32
inches deep by 16 to 18 inches high. Each bale was bound by wire that needed to be
cut off before the bale entered the hydropulper. 

 A clamp truck moved the bales of paper pulp throughout the plant. The bales
were usually in stacks of six, because they arrived on trains stacked that way. When
the clamp truck moved the stack of six bales, it used vertical clamps to grasp the
bottom three bales to lift the entire stack of six bales, which left the top two to three
bales unrestrained by the clamp. 

 Using the Ranger conveyor, four employees worked together as a crew to move
bales into the hydropulper. One employee operated the clamp truck to lift a stack of
six bales to transport them to the end of the conveyor. The stack was then placed
onto the end of the conveyor. Once on the conveyor, the clamp truck operator moved
the clamp apparatus to hold the second through fourth bales, thus allowing the bottom
bale to be released and carried down the conveyor. This process was repeated until
the entire stack of bales was placed on the conveyor. As the bales worked their way
down the conveyor, one employee would cut the wire binding, while another
employee pulled off the wire. A fourth employee would operate controls to move the
conveyor forward so that the bales would be dropped into the hydropulper vat.

 On the night of November 2, 1999, Davis's job was to cut the binding wire as
the bale moved from one end to the other end of the conveyer. When the clamp truck
brought a stack of six bales to the end of the conveyor, it set one bale down, and
moved the clamps to clasp the second through fourth bales. The first bale had already
been moved up the conveyor to approach the position where its wires would be
removed. The second bale had not yet been placed onto the conveyor. When the
accident occurred, both the clamp truck and the conveyer were stopped. The top
bales that were stacked on the clamp truck, but were not held by the clamps, fell.

 Davis was standing at the designated place for cutting wires, which was about
one-and-one-half to two feet from the conveyor. Davis tried to spin away to avoid
the falling bales, but one hit him, impaling his hand on one of the conveyor's spikes. 
Davis was taken away by ambulance and began an arduous course of medical
treatment.

 After Davis's injury, changes were made to prevent a similar accident. The
operator of the clamp truck was immediately instructed to lift only three bales at a
time while loading bales onto the conveyor. About a week after Davis's injury,
Pasadena Paper had a cage installed between the clamp truck and the conveyor to
block bales from falling from the clamp truck onto the conveyor. The cage was not
attached to the conveyor, but instead was mounted to another structure. The cage has
successfully prevented further injuries from falling bales.

 Ranger did not place warning labels on the conveyor system telling workers to
avoid the area at the interface of the conveyor and clamp truck due to the falling
hazard, nor did it provide Pasadena Paper with instructions or warnings that
employees should be kept away from that area. Additionally, Ranger did not provide
Pasadena Paper with an operator's manual. Warren Pearson, Ranger's employee who
sold the conveyor to Pasadena Paper, acknowledged that he did not provide any
safety documents or safety sheets with the conveyor, even though he occasionally
provides those documents to people who are going to be using conveyors sold by
Ranger. Ranger was not asked to provide, and did not provide, any information or
training to the workers who were going to be working on the conveyor system.

 At trial, the parties disputed whether Ranger was asked to design a conveyor
that was to be loaded with bales one at a time, or in stacks of six by use of a vertical
clamp truck. According to Ranger, Pasadena Paper requested a conveyor that was to
be loaded with bales one at a time. Pearson testified that his understanding was that
Pasadena Paper would load bales one at a time with a clamp truck, and that it was
never the plan for six bales in a vertical stack to be loaded onto the conveyor at once. 
After the conveyor was installed, Pearson examined the conveyors in use at the plant. 
Pearson testified that he observed bales lined up horizontally on the conveyor, but
never saw bales vertically stacked on the conveyor. 

 Scott Collier, a Ranger employee, was the draftsman that designed the
conveyor. Collier testified that he did not see the purchase order, but acknowledged
that if he had seen the purchase order for a 25-foot conveyor, it "would have brought
to attention some type of vertical orientation of the bales, which would have included
some other framework or something for safety versus just the conveyor itself" and he
would have designed a safety device to incorporate that vertical association of bales. 
Collier denied knowledge that a clamp truck was going to be loading the conveyor.

 Davis's expert, William Purcell, who specializes in safety engineering, testified
that the problem with the conveyor was that there was a possibility that a bale could
slip and fall at the interface between the clamp truck and the conveyor. The "problem
with the way Ranger designed" the conveyor, according to Purcell, was that "when
the load comes in, that - that it's possible that a load might fall, might slip in the
interfacing between the forklift and the conveyor. It could be - and that's a hazard. 
That's a foreseeable hazard, that bale could actually fall and then possibly even strike
somebody when it fell." Purcell testified that the conveyor did not meet the standards
for conveyors set forth in the American Society of Mechanical Engineers (ASME)
and Occupational Safety and Health Administration (OSHA) regulations. 

 In contrast to Ranger's testimony, Davis contended at trial that Ranger was
informed that the bales would be loaded onto the conveyor by the clamp truck in
stacks of six. Tuan Nguyen, Pasadena Paper's senior project engineer, ordered the
conveyor from Ranger after discussing his desires for the project with Pearson,
Ranger's salesman. Nguyen explained that his requirements for the conveyors that
he ordered were that he wanted the spiked conveyors to hold each bale up from the
conveyor's surface so that the wires that surrounded each bale could more easily be
removed by the workers. According to Nguyen, the plan was for the clamp truck to
bring a vertical stack of bales to the conveyor, then the clamp truck would drop each
bale on the conveyor until five or six bales were lying across the conveyor. The
workers would not move in until the stack of five or six bales were laid across the
conveyor. The workers would then cut the wires from all the bales that were lying
across the conveyor, and then the bales would all be moved into the hydropulper at
once. Nguyen testified that he described to Pearson "the entire process" of
transporting pulp bales, from removing them from the rail cars to placing bales on the
end of the conveyor. Nguyen said that Pearson came to the plant to see the operation
in progress, which would have included observation of the vertical stacking if the
conveyor was in operation. Nguyen denies that he ever told anyone at Ranger that
only one bale at a time would be set on the end of the conveyor "[b]ecause that would
defeat the whole purpose of the conveyor, because that's what we were doing before
the conveyor. Grab one bale, set it on top of the Hydropulper, pull the wire, dump." 
Nguyen's testimony was supported by Noel Spinks, a plant employee, who said that
it was never their procedure to place one bale at a time on the Ranger conveyor. 
Spinks, who was working near Davis on the night Davis was injured, said that
employees were "told we had to use a full stack to be able to keep up with the
production machine." 

 Nguyen approved the drawings of the conveyor design, inspected the conveyor
after it was built, and accepted it. Nguyen personally looked at the conveyor and felt
it was safe, as did Pasadena Paper's safety and quality division.

 Pasadena Paper acknowledged that it was responsible for training employees
to use the conveyor. Bayless, a supervisor at the plant, and Spinks each testified that
workers at the plant were trained on the operation of the conveyors by supervisors. 
Spinks, however, said that employees were not warned about the danger of falling
bales near the conveyors. The Ranger conveyors were already being used by the
hydropulper department when Davis started working in that department, and Davis
said that he received "no training whatsoever" on how to operate the conveyors.

 Ranger acknowledged that it was responsible for designing a safe conveyor,
and it contends that it complied with that request by installing the emergency stop
cord on the conveyor. According to Frank Loeffler, an expert who testified for
Ranger, the conveyor produced by Ranger was "a standard conveyor" that had been
used for many years. Loeffler explained that Ranger does not have the expertise to
advise a paper company how to use a clamp truck or how to deliver a product onto
the conveyor belt. According to Loeffler, Ranger did not agree to provide extraneous
safety features that were not actually part of the conveyor. He also specifically
testified that there was no agreement for Ranger to install a bale guard. 

 At trial, the evidence showed that after Ranger installed the conveyor, but
before the incident involving Davis, Pasadena Paper made additions and changes to
the Ranger conveyor system. Pasadena Paper added a three-foot square concrete pad,
which is where Davis was standing during the accident. The pads were installed for
shorter workers in order to make it easier to reach and cut the binding wires. 
Pasadena Paper also installed a barrier guard to protect the conveyor from trucks
running into it, as well as foot control pedals to run the conveyor. No evidence in the
record shows that Ranger participated in any of these changes.

 Davis sued Ranger for negligence and strict products liability, alleging both a
design defect and a marketing defect. The jury found in favor of Davis on the
marketing defect issue and for Ranger on the design defect and negligence issues. 
The jury answered affirmatively that there "was a defect in the marketing of the
Ranger Conveying equipment at the time it left the possession of Ranger that was a
producing cause of the occurrence or injury in question[.]" (2) The jury's failure to find
any design defect in the conveyor that was the producing cause of Davis's injuries 
has not been challenged on appeal by Davis.

Duty to Warn of Danger at the Interface Area

 In its third issue, Ranger contends that the trial court erred by denying Ranger's
motion for JNOV because "Ranger did not owe or breach any duty to Davis under the
facts of this case" or "to [Pasadena Paper] to formulate facility policies." Ranger
explains that "[t]he alleged hazard arose from [Pasadena Paper's] operations and not
from a risk of harm inherent in the product." According to Ranger, the hazard "arose
from [Pasadena Paper's] practice of utilizing a clamp truck to lift more bales than
could be supported by the clamps of the truck" and not from the "conveyor [that]
operated the way it was intended to operate." Ranger explains, 

 There is and should be a distinction between a conveyor and a
company's system of transporting goods throughout a facility. 
Unquestionably, Ranger would be involved in the safety of the
conveyor. However, [Pasadena Paper] determined and controlled the
conveyor system which included multiple stages.


Ranger cites to USX Corp. v. Salinas, 818 S.W.2d 473, 482-83 (Tex. App.--San
Antonio 1991, writ denied) to support its assertion that the hazard arose from the
operations at the plant and not from a risk of harm inherent in the product. (3)

A. Preservation of Error

 In his motion for rehearing, Davis contends that Ranger did not preserve the
issue of what he characterizes as the "component-parts defense" for appeal. Davis
contends that (1) Ranger failed to plead the defense and (2) under the Texas Supreme
Court's recent decision in Equistar Chemicals, L.P. v. Dresser-Rand Co., No. 04-0121, 2007 WL 1299161 (Tex. May 4, 2007), Ranger's general JNOV was
insufficient to preserve the component-parts issue.

 Davis asserts that the component parts defense is an affirmative defense and 
as such, must be pleaded or it is waived. Davis cites to no authority that states that
the component-parts defense is an affirmative defense. In contrast, Texas cases
discuss the liability of a component-parts manufacturer in terms of duty. See Brocken
v. Entergy Gulf States, Inc., 197 S.W.3d 429, 437 (Tex. App.--Beaumont 2006, no
pet.) ("The Brockens failed to show that Cooper, a component-part manufacturer,
under these facts and circumstances, had a duty to warn Entergy of the dangers of
using a recloser for the special purpose that the Brockens assert Entergy used it.")
(emphasis added); Toshiba Int'l Corp. v. Henry, 152 S.W.3d 774, 783 (Tex.
App.--Texarkana 2004, no pet.) ("Toshiba had no duty to the Henrys because it did
not participate in the integration of its component part into the scrap winder system.")
(emphasis added). 

 Whether a duty exists is a question of law for the courts. See Humble Sand &
Gravel, Inc. v. Gomez, 146 S.W.3d 170, 181 (Tex. 2004). In other words, an
assertion of lack of a legal duty is not an affirmative defense because:

 The burden is on a plaintiff to prove the existence and violation of a
legal duty owed by the defendant in order to establish tort liability. 
Coleman v. Hudson Gas & Oil Corp., 455 S.W.2d 701, 702 (Tex. 1970). 
Lack of duty is not an affirmative defense because duty is an essential
element of a plaintiff's case. Id.


Toles v. Toles, 113 S.W.3d 899, 909 (Tex. App.--Dallas 2003, no pet.). Because the
component parts issue goes to the existence of a duty, it is not an affirmative defense
that must be pleaded. See id. Thus, Ranger's failure to plead that it was a component
parts manufacturer cannot be the basis to find that it failed to preserve the issue as
Davis contends.

 Davis further asserts that the recent supreme court opinion in Equistar
Chemicals shows that Ranger failed to preserve the component parts issue for appeal. 
In Equistar Chemicals, the defendant, Dresser-Rand, appealed a jury verdict in favor
of the plaintiff, Equistar. Equistar Chemicals, 2007 WL 1299161, at *2. On appeal,
Dresser-Rand contended that its no-evidence objections to the damages question and
its motion for JNOV were sufficient to preserve error on the grounds that the
economic loss rule precluded Equistar's recovery. Id. The supreme court noted that
Dresser-Rand only objected to the jury charge regarding damages on no-evidence
grounds. Id. at *1. Dresser-Rand did not object to the damages question or
instruction as submitted, and thus waived any error. Id. at *3. The supreme court
cited to Texas Rule of Civil Procedure 274, which states, in pertinent part, "A party
objecting to a charge must point out distinctly the objectionable matter and the
grounds of the objection. Any complaint as to a question, definition, or instruction,
on account of any defect, omission, or fault in pleading, is waived unless specifically
included in the objections." Tex. R. Civ. P. 274; Equistar Chemicals, L.P., 2007
WL 1299161, at *3. Further, the supreme court noted that even if the no-evidence
points raised by Dresser-Rand necessarily encompassed the contention that no tort
duty was owed under the facts of the case, the question as to how much damages, if
any, Equistar could recover was an issue that "existed in the suit independent of the
tort issues and questions." Equistar Chemicals, 2007 WL 1299161, at *4. However,
the supreme court expressly withheld deciding whether a general no-evidence
objection covered the contention "that [Dresser] owed no tort duty under the facts [of
this case]." Id.

 In contrast, in this case, the no-evidence point did not concern a jury question. 
Further, the no-evidence challenge here was only to the existence of duty, which is
a question of law for the court. The component parts issue did not remain an issue
in the case independent of Ranger's challenge, as the issue of damages remained in
Equistar Chemicals. See id. at *4. As noted in our original opinion, a "no-duty"
challenge may be preserved by a motion for JNOV. See Chavez Constr., Inc. v.
McNeely, 177 S.W.3d 593, 598 (Tex. App.--Houston [1st Dist.] 2005, pet. granted,
pet. dism'd by agr.); Battaglia v. Alexander, 93 S.W.3d 132, 140 (Tex.
App.--Houston [14th Dist.] 2002), rev'd on other grounds, 177 S.W.3d 893 (Tex.
2005). In its motion for JNOV, Ranger asserted that it "did not owe or breach any
duty to [Davis] under the facts of this case." In addition, unlike Dresser-Rand in
Equistar Chemicals, who did not identify the economic loss rule before the trial court,
Ranger specifically asserted that it was not liable as a component parts manufacturer. 
Specifically, in moving for an oral instructed verdict at the close of all of the
evidence, Ranger asserted as grounds:

 All the evidence in this case has been that this conveyor was a
component part of a larger system. The Supreme Court in--I can't think
of the case name, but it's within the last six months--has decided that
the manufacturer of a non-defective component part is not strictly
responsible to the plaintiff for any injuries that he suffered because of
a defect in the system.


 Because the facts of this case are distinguishable from those in Equistar
Chemicals and because Ranger expressly asserted the component parts doctrine to the
trial court, we conclude that Ranger has preserved this issue for our review. See
Chavez Constr., Inc., 177 S.W.3d at 598 (holding that "general no-evidence-of-negligence" ground asserted in motion for new trial preserved question of no duty for
appellate review).

B. Products Liability and Component Parts

 In order to recover for an injury on the theory of products liability, the plaintiff
bears the burden of proving that (1) the defendant placed a product into the stream of
commerce; (2) the product was in a defective or unreasonably dangerous condition;
and (3) there was a causal connection between that condition and the plaintiff's
injuries or damages. Houston Lighting & Power Co. v. Reynolds, 765 S.W.2d 784,
785 (Tex. 1988); Armstrong Rubber Co. v. Urquidez, 570 S.W.2d 374, 376 (Tex.
1978). However, "the law of products liability does not guarantee that a product will
be risk free, since most products have some risk associated with their use." 
Caterpillar, Inc. v. Shears, 911 S.W.2d 379, 381 (Tex. 1995).

 A product may be unreasonably dangerous due to a defect in its manufacture
(manufacturing defect) or design (design defect), or because of a failure to provide
adequate warnings or instructions (marketing defect). Am. Tobacco Co. v. Grinnell,
951 S.W.2d 420, 426 (Tex. 1997); Caterpillar, 911 S.W.2d at 382; Turner v. Gen.
Motors Corp., 584 S.W.2d 844, 847 (Tex. 1979). Here, the jury found a marketing
defect. A marketing defect is proven when the evidence shows that a defendant fails
to warn of a product's potential dangers, when warnings are required, and that the
lack of adequate warnings or instructions renders an otherwise adequate product
unreasonably dangerous. See Lucas v. Tex. Indus., Inc., 696 S.W.2d 372, 377 (Tex.
1984); Benavides v. Cushman, Inc., 189 S.W.3d 875, 881 (Tex. App.--Houston [1st
Dist.] 2006, no pet.) (citing Grinnell, 951 S.W.2d at 426). The elements of a
marketing defect cause of action are (1) a risk of harm must exist that is inherent in
the product or that may arise from the intended or reasonably anticipated use of the
product, (2) the supplier of the product knows or reasonably should foresee the risk
of harm at the time the product is marketed, (3) the product has a marketing defect,
(4) the lack of instructions or warnings renders the product unreasonably dangerous
to the ultimate user or consumer of the product, and (5) the failure to warn or instruct
causes the user's injury. Olympic Arms, Inc. v. Green, 176 S.W.3d 567, 578 (Tex.
App.--Houston [1st Dist.] 2004, no pet.). 

 A component part manufacturer who does not participate in the integration of
the component into the final system or product is not liable for defects in the final
system or product if the component itself is not defective. Bostrom Seating, Inc. v.
Crane Carrier Co., 140 S.W.3d 681, 683 (Tex. 2004); Molina v. Kelco Tool & Die,
Inc., 904 S.W.2d 857, 861 (Tex. App.--Houston [1st Dist.] 1995, writ denied) ("A
component part manufacturer that supplies a product in accordance with a purchaser's
specifications is free from strict liability if the component part itself is not
defective."). (4) For a duty to warn to be imposed on a component-part manufacturer
or seller, it must have "actively participated in the integration process." See Henry,
152 S.W.3d at 783 (citing Restatement (Third) of Torts: Products Liability
§ 5 (1998)); see also Bostrom Seating, 140 S.W.3d at 685 ("Crane was in total control
of the design of [the restraint] system, and Bostrom, playing no part in the design of
the truck, cannot be held liable for its possible defectiveness."); Molina, 904 S.W.2d
at 861.

 Bostrom Seating and Henry both cite to and rely on the Restatement (Third) of
Torts. Bostrom Seating, 140 S.W.3d at 683; Henry, 152 S.W.3d at 783. The
Restatement provides:

 One engaged in the business of selling or otherwise distributing product
components who sells or distributes a component is subject to liability
for harm to persons or property caused by a product into which the
component is integrated if:

 

 (a) the component is defective in itself, as defined in
this Chapter, and the defect causes the harm; or

 

 (b)(1) the seller or distributor of the component 
substantially participates in the integration of the
component into the design of the product; and

 

 (b)(2) the integration of the component causes the product
to be defective, as defined in this Chapter; and

 

 (b)(3) the defect in the product causes the harm.


Restatement (Third) of Torts: Products Liability § 5. The comments and
reporters' note to section 5 clarify the extent of liability that is based on a failure to
warn. A component seller has a "duty to supply reasonable instructions and warnings
to the component buyer." Id. cmt. b. Additionally, "the duty is to warn only
immediate buyers and not to warn users of integrated final products." Id. cmt. b
Reporters' Note. Finally, the Restatement acknowledges that components may
"function on their own but still may be utilized in a variety of ways by assemblers of
other products" or may "include products that can be put to different uses depending
on how they are integrated into other products." Id. cmts. a, d. In that case, a "safety
feature important for one adaptation may be wholly unnecessary or inappropriate for
a different adaptation." Id. cmt. d.

C. Analysis

 As noted in our original opinion, Ranger designed, produced, and installed the
conveyor that was undisputedly a component of the plant's larger bale-handling
system that was composed of the clamp trucks that loaded the bales onto the conveyor
itself, at one end, and the hydropulper that processed the de-wired bales, at the other
end. In his motion for rehearing, Davis contends that this Court erred by
characterizing the conveyor as "undisputedly a component of the plant's larger bale-handling system." (Emphasis added). Specifically, Davis contends that "Ranger's
conveyors stood alone and that their only purpose was to act as conveyors." In
support of this contention, Davis relies on the following testimony:

  Purcell testified that the conveyor "was a component of a larger
operation" and was "part of a larger process" of putting pulp bales
into the hydropulper. Purcell also testified:


 The operation that goes on there at the conveyor is
de-wiring. The conveyor itself does nothing but
receive material and move the materials
horizontally. That is all the conveyor does. It does
not de-wire. The people do the de-wiring. It's
just--it receives material and moves it horizontally
into where--until it drops into the Hydropulper.


  Pearson testified that the conveyors were intended to be "just part
of a process that they were instituting to get bales into the
hydropulper." However, he also referred to the conveyors as the
new "system" installed at the plant.


  Loeffler characterized the "system" at Pasadena Paper's plant as
beginning with unloading bales from rail cars and ending with
completed paper. He specifically stated that the conveyor is "just
a component piece of an overall system." However, he also
testified that "[t]he new system was two brand new conveyors." 


Davis also identifies Purcell's testimony that an interface is "where two pieces of
equipment come together" and that the clamp truck and the conveyor had to interface
as further support that the conveyor is not a component.

 Davis further attempts to distinguish the cases cited in our original opinion to
show that the conveyor was not a component part. In Bostrom Seating, the
component was a driver's seat that was integrated into a garbage truck. 140 S.W.3d
at 683. In Molina, a die was incorporated into a press. 904 S.W.2d at 859. In
Toshiba International Corp., the defendant manufactured an inverter--a device that
converted and regulated power flow--that was incorporated into the control panel of
a larger machine. 152 S.W.3d at 777. In Buonanno v. Colmar Belting Co., Inc., a
wing pulley was integrated into a conveyor. 733 A.2d 712, 714 (R.I. 1999). Davis
is correct in pointing out that in each of these cases, the component was a part of a
larger final machine or product, and not, like the conveyor, a product in and of itself. 
Davis, however, fails to distinguish other cases cited in the original opinion with facts
analogous to this case, in which the injury results from the interface of the product
with other equipment.

 In our original opinion in this case, we cited to Cipollone v. Yale Indus. Prods.,
Inc., 202 F.3d 376, 379 (1st Cir. 2000) (applying Massachusetts law), which was
cited favorably by the supreme court in Bostrom Seating. See Bostrom Seating, 140
S.W.3d at 683. In Cipollone, the component was a "customized dock lift" that was
integrated into a "material-handling system." Cippollone, 202 F.3d at 378 (emphasis
added). The court applied the Restatement (Third) of Torts, section 5, to the dock
lift--a complete product in itself. Id. at379. In addition, in Brocken, a recloser (a
circuit breaker) was installed as a part of a utilities' electrical distribution system. 
197 S.W.3d at 432. Further, in Davis v. Komatsu American Industries Corp., also
cited favorably by the supreme court in Bostrom Seating, the defendant manufactured
a press that was incorporated into an assembly line made up of various stages,
including multiple individual presses and a conveyor. 42 S.W.3d 34, 36-37 (Tenn.
2001). The Tennessee Supreme Court adopted and applied section 5 of the
Restatement (Third) of Torts, although the press was a completed product and part
of an assembly line. Id. at 35. Thus, contrary to Davis's assertions, courts have
applied the component parts doctrine to components, complete in and of themselves,
that function as part of a larger "system." See also Zaza v. Marquess and Nell, Inc.,
675 A.2d 620, 626-27 (N.J. 1996) (citing draft of Restatement (Third) of Torts and
applying component parts doctrine to tank that was "component part for an integrated
manufacturing system" for decaffeinating coffee beans).

 As a component part manufacturer, Ranger has no duty to warn of dangers
unless (1) the component itself is defective or (2) it actively participated in the
integration of the component into the final system. See Bostrom Seating, 140 S.W.3d
at 683-84; Molina, 904 S.W.2d at 861; Restatement (Third) of Torts: Products
Liability § 5.

 The jury answered "No" in response to the design defect question in the charge. 
Thus, the jury did not find that a design defect in the conveyor was the cause of
Davis's injury, despite the failure to attach a guard at the interface area to prevent the
vertical stack of bales from falling on the conveyor. Davis has not challenged the
jury's verdict that there was no design defect in the Ranger conveyor that was the
cause of his injuries. As a component part manufacturer, Ranger had no duty to warn
of dangers of a non-defective component. See Bostrom Seating, 140 S.W.3d at 683
(holding that, because no evidence showed that seat was defective and seat
manufacturer did not participate in integration of seat into truck design, seat
manufacturer was not liable for defect in truck); Henry, 152 S.W.3d at 784 (holding
no duty to warn of potentially dangerous condition caused by integration of non-defective component into system designed by another); Molina, 904 S.W.2d at 861
(holding that component-part manufacturer not strictly liable where evidence
established that component part met specifications and was integrated into larger unit
before distribution). (5)

 Because the component itself was not defective, Ranger only had a duty to
warn if it actively participated in the integration of the component into the final
system. See Bostrom Seating, 140 S.W.3d at 683; Molina, 904 S.W.2d at 861. No
evidence shows that Ranger actively participated in the integration of the conveyor
into the larger conveyor system. The evidence is undisputed that Ranger was not
hired to and did not participate in the design, production, or installation of the larger
system of transporting bales at the plant, which included the use of the clamp truck
and the ultimate deposit of the bales into the hydropulper. The evidence is
undisputed that Ranger was hired only to design, produce, and install the conveyor
itself. 

 Davis contends that Ranger is liable for failure to warn of the dangers at the
interface area because Ranger "knew or should have known of the danger posed by
bales stacked at the end of the spiked conveyor." The interface area, however, was
not part of the conveyor itself, but was part of the larger system that included the
loading of bales with the clamp truck. Davis described the interface area in his brief
as follows:

 The risk was in the interface between the clamp truck with its stack of
bales and the spiked conveyor. More specifically, the danger was that
a worker's hand could be punctured in one side and out the other by a
spike in the conveyor if a bale were to fall during loading. 


According to Davis, the interface area is the area where the clamp truck meets the
conveyor, but that area was undisputedly part of the larger bale-handling system that
included the clamp truck. As Ranger points out, Ranger had no duty to warn of the
interface area because that was a hazard that arose from Pasadena Paper's practice of
utilizing a clamp truck to lift more bales than could be supported by the clamps of the
truck and not from the "conveyor [that] operated the way it was intended to operate." 
See Crossfield v. Quality Control Equip. Co., 1 F.3d 701, 703-04 (8th Cir. 1993)
(holding no liability for failure to warn because no evidence showed that component
"malfunctioned or failed to perform as intended").

 Cases from other jurisdictions have applied section 5 of the Restatement
(Third) of Torts in analogous situations. See Cipollone, 202 F.3d at 379 (applying
Massachusetts law); Buonanno, 733 A.2d at 716. In Cipollone, Cipollone filed suit
against Yale, alleging that there was a defect or unreasonably dangerous condition in
a loading dock lift that Yale manufactured. Cipollone, 202 F.3d at 378. Yale
manufactured the lift as specified by Cipollone's employer, FedEx, and the lift was
made a part of a larger package-handling system that FedEx designed with an outside
consultant. Id. After Cipollone was injured, he alleged that the narrow spacing
between the lift and an adjacent catwalk created an unreasonably dangerous
condition. Id. The trial court granted summary judgment for Yale. Id. The court,
citing section 5 of the Restatement (Third) of Torts, noted that a dock lift that was
integrated into a larger package-handling system was a product that "function[s] on
[its] own but still may be utilized in a variety of ways by assemblers of other
products." Id. at 379 (quoting Restatement (Third) of Torts: Products
Liability § 5 cmt. a). The court affirmed the summary judgment in favor of Yale
because there was no evidence that the lift was defective and it was "merely a
component of FedEx's larger package-handling system." Id.

 In Buonanno, Buonanno was injured when his arm was caught in a "nip point" (6)
of a large conveyor. 733 A.2d at 713. Buonanno brought suit against Emerson
Power Transmission Corporation, and others, alleging a defect in the conveyor and
the wing pulley. Id. The wing pulley was a component part of the nip point that was
manufactured by Emerson Power. Id. at 714. The trial court rendered summary
judgment for Emerson Power, and Buonanno appealed. Id. at 715. After discussing
the provisions in the Restatement (Third) of Torts for liability of a component part
manufacturer, the court adopted section 5 of the Restatement. Id. at 716. The court
noted that there was no evidence that Emerson Power participated in the design of the
conveyor system, but only supplied the wing pulley. Id. at 717. Therefore, Emerson
Power could not be liable under section 5(b) of the Restatement (Third) of Torts. See
Restatement (Third) of Torts: Products Liability § 5(b). The court then
examined whether the wing pulley was "defective in itself," as required to support
liability under section 5(a). See Restatement (Third) of Torts: Products
Liability § 5(a). Under the Restatement, a defect must exist "at the time of sale or
distribution." Buonanno, 733 A.2d at 717 (quoting Restatement (Third) of Torts:
Products Liability § 2 (1998)). The court noted that "the nip point is created only
when the belt meets the wing pulley after the entire conveyor belt system is
assembled." Id. Therefore, the court concluded that Emerson Power could not be
liable on that basis. Id. (7) 

 Here, Ranger manufactured a conveyor. Like the lift in Cipollone, it is a
product that can be put to different uses depending on how it is integrated into other
products. See Cipollone, 202 F.3d at 379; Restatement (Third) of Torts:
Products Liability § 5 cmt. d. Because a product like the conveyor can be used in
a variety of ways, a "safety feature important for one adaptation may be wholly
unnecessary or inappropriate for a different adaptation." Restatement (Third) of
Torts: Products Liability § 5 cmt. d. For example, a warning about falling bales
would not be necessary if the conveyor was used as part of a system that transported
bales without stacking them. Further, like the nip point and wing pulley in
Buonanno, the dangerous condition alleged by Davis--the "interface"--did not exist
until the Ranger conveyor was integrated into Pasadena Paper's bale-handling system. 
See Buonanno, 733 A.2d at 717; see also Restatement (Third) of Torts:
Products Liability § 2 (defect must exist "at the time of sale or distribution");
Bostrom Seating, 140 S.W.3d at 683 (holding that "if the component-part
manufacturer does not participate in the integration of the component into the
finished product, it is not liable for defects in the final product if the component itself
is not defective") (citing Restatement (Third) of Torts: Products Liability §
5); Brocken, 197 S.W.3d at 436 (applying principles of Bostrom Seating and the
Restatement to marketing defect case); Henry, 152 S.W.3d at 783 (same).

 We conclude that Ranger had no duty to warn of the larger system because no
evidence shows that it actively participated in the integration process. See Bostrom
Seating, 140 S.W.3d at 683; Molina, 904 S.W.2d at 861. Ranger had no duty to warn
of the dangers at the interface area because the conveyor was a component of the
larger bale-handling system; the jury did not find a defect in the conveyor itself; and
Ranger did not actively design or participate in the integration of the conveyor into
the larger system that included the loading of bales with a clamp truck. See Bostrom
Seating, 140 S.W.3d at 683; Henry, 152 S.W.3d at 783; Molina, 904 S.W.2d at 861. 
Further, Ranger did not design the "interface." See USX Corp., 818 S.W.2d at 487
("It is a fundamental principle of products liability law that the plaintiff must prove
that the defendant supplied the product which caused the injury.") (citing Gaulding
v. Celotex Corp., 772 S.W.2d 66, 68 (Tex. 1989)). Thus, the evidence is legally
insufficient to support the jury's finding of a marketing defect. See Bostrom Seating,
140 S.W.3d at 683; Henry, 152 S.W.3d at 783; Molina, 904 S.W.2d at 861. As the
jury found no design defect in the product and no negligence on behalf of Ranger, no
liability theory supports the verdict.

 We sustain Ranger's third issue.

Conclusion

 We reverse and render judgment that Davis take nothing from Ranger.





 Elsa Alcala

 Justice


Panel consists of Chief Justice Radack and Justices Alcala and Bland.
1. Ranger presents six additional issues in this appeal that we do not reach. In its first
issue, Ranger contends that the trial court erred by rendering judgment in favor of
Davis and by denying Ranger's motion for JNOV because there was no evidence to
support the jury's finding that there was a marketing defect of the Ranger conveyor
at the time it left the possession of Ranger that was a producing cause of the injury or
occurrence. In its second issue, Ranger contends that the trial court erred by
rendering judgment in favor of Davis and by denying Ranger's motion for JNOV
because "as a matter of law, the alleged danger was open and obvious." In its fourth,
fifth, and sixth issues, Ranger contends that the trial court erred by denying its motion
for leave to file an amended answer to include the issue of comparative negligence
and refusing to instruct the jury regarding comparative negligence and "sole cause." 
In its seventh issue, Ranger asserts that "the trial court erred in denying Ranger's
Motion for New Trial because there was factually insufficient evidence to support the
jury's findings of a market defect and causation."
2. The charge defined "defect in marketing" as "a failure to give adequate warnings of
the Ranger Conveying equipment's dangers that were known or by the application of
reasonably developed human skill and foresight should have been known, or a failure
to give adequate instructions to avoid such dangers, which failure rendered the
conveyor unreasonably dangerous as marketed." The charge also defined
"'[a]dequate' warnings and instructions" as "warnings and instructions given in a
form that could reasonably be expected to catch the attention of a reasonably prudent
person in the circumstances of the conveyor's use; and the content of the warnings
and instructions must be comprehensible to the average user and must convey a fair
indication of the nature and extent of the danger and how to avoid it to the mind of
a reasonably prudent person." The jury charge further defined an "unreasonably
dangerous" product as a product "that is dangerous to an extent beyond that which
would be contemplated by the ordinary user of the conveyor with the ordinary
knowledge common to the community as to the conveyor's characteristics."
3. USX Corp. was a marketing defect case involving an oil rig elevator. USX Corp. v.
Salinas, 818 S.W.2d 473, 477 (Tex. App.--San Antonio 1991, writ denied). USX
was the retailer of an oil rig package that included an elevator. Id. The plaintiffs
were injured when the elevator collapsed because of a defective hydraulic cylinder
that was part of the elevator. Id. at 477-78. Before the elevator collapsed, the
hydraulic cylinder was replaced with a cylinder purchased from a retailer and
manufacturer other than USX. Id. at 485. USX contended that because it had no part
in manufacturing or marketing the replacement cylinder, it could not be liable for a
marketing defect. Id. at 487. In discussing the issue, the court emphasized that "[i]t
is a fundamental principle of products liability law that the plaintiff must prove that
the defendant supplied the product which caused the injury." Id. (citing Gaulding v.
Celotex Corp., 772 S.W.2d 66, 68 (Tex. 1989)).
4. Bostrom Seating was a design defect case. Bostrom Seating, Inc. v. Crane Carrier
Co., 140 S.W.3d 681, 682 (Tex. 2004). Kelco was a case involving claims for design,
manufacturing, and marketing defects. Molina v. Kelco Tool & Die, Inc., 904 S.W.2d
857, 861 (Tex. App.--Houston [1st Dist.] 1995, writ denied). Other courts have
applied the same principle to marketing defect cases. Brocken v. Entergy Gulf States,
Inc., 197 S.W.3d 429, 436 (Tex. App.--Beaumont 2006, no pet.); Toshiba Int'l Corp.
v. Henry, 152 S.W.3d 774, 783 (Tex. App.--Texarkana 2004, no pet.).
5. In addition, the conveyor itself had sharp spikes emanating from it that were open and
obvious, and, thus, Ranger had no duty to warn about those spikes. See Caterpillar,
Inc. v. Shears, 911 S.W.2d 379, 382 (Tex. 1995) (holding that there is no duty to warn
of obvious risk associated with front-end loader that had open cab without safety
cage); Joseph E. Seagram & Sons, Inc. v. McGuire, 814 S.W.2d 385, 388 (Tex. 1991)
(holding that there is no duty to warn of dangers of excessive or prolonged use of
alcohol since these dangers are already so widely recognized); Hagans v. Oliver
Mach. Co., 576 F.2d 97, 102 & n.5 (5th Cir. 1978) (after noting "obvious" dangers
of table saw, stating that "a warning of the dangers involved in using the saw would
not have informed [the plaintiff] of anything he did not already know"). 
6. "A 'nip point' is created where the conveyor belt moves over the stationary portion
of the conveyor-belt system, or the 'wing pulley.' The wing pulley prevents waste
materials from getting caught between the roller and the belt." Buonanno v. Colmar
Belting Co., Inc., 733 A.2d 712, 713 n.1 (R.I. 1999). 
7. Ultimately, the court found that summary judgment was improper because a fact issue
existed on other theories of liability presented to the trial court. Id. at 717.