**Opinion issued November 24, 2020**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00373-CV

_____

**FUJI ELECTRIC CO., LTD., Appellant**

**V.**

**DAVID PEREZ, Appellee**

**On Appeal from the 234th District Court
Harris County, Texas
Trial Court Case No. 2017-19265**

# O P I N I O N

In this interlocutory appeal, appellee, David Perez, sued multiple defendants, including appellant, Fuji Electric Company, Limited (Fuji), a Japanese company, for injuries he allegedly sustained in 2016 when a transformer designed and

manufactured by Fuji exploded in a Texas facility near where he was working. Perez asserted claims for negligent misrepresentation, negligence, gross negligence, and products liability. Fuji filed a special appearance.

After a hearing, the trial court denied Fuji's special appearance, ruling that it could properly exercise specific personal jurisdiction over Fuji. On appeal, Fuji challenges the denial of its special appearance, arguing that it lacks minimum contacts with Texas required for Texas courts to assert jurisdiction over it and that exercising jurisdiction would offend traditional notions of fair play and substantial justice.

We affirm.

## Background

Fuji is a Japanese company with its principal place of business in Japan, and it designs and manufactures electrical transformers. In 2001, Fuji received an order for eleven transformers to be delivered by 2002. It designed each of the transformers with the same specifications using component bushings from a third-party Japanese manufacturer. According to Fuji's own documents, the eleven transformers cost nearly $14 million and were designed and manufactured specifically for three electrical facilities in the United States: four for the Cottonwood facility in Texas, four for the Redbud facility in Oklahoma, and three for the Magnolia facility in Mississippi. Fuji then sold the transformers to Fuji Electric Corporation of America

(Fuji America), a separate company with a New Jersey mailing address, that in turn sold the transformers to Bechtel Power Corp., a Maryland company, and shipped them to Bechtel in New Jersey. The transformers were then delivered from New Jersey to the Cottonwood, Redbud, and Magnolia facilities.

In May 2010, one of the eleven transformers that Fuji had designed and manufactured "failed catastrophically" in the Cottonwood facility when a component bushing inside the transformer "failed and faulted to ground," causing an oil fire that was suppressed by the transformer's fire protection system. According to a report issued by a third-party engineering firm, MPR Associates Inc. (the MPR report), investigators inspected the transformer after the explosion, interviewed site personnel, and evaluated potential causes of the failure. The investigators met with Wataru Tamura and Akira Matsuyama, whom the report stated were "representatives of Fuji," at the Cottonwood facility and "performed a second walkdown and inspection of the equipment." The report noted that Fuji was "the original equipment manufacturer" and that Fuji was "now part of Japan AE Power Systems."

The investigators found "a small machining or fabrication defect" and "four rub marks" or scratches on the damaged bushings, which investigators "discussed with Fuji during their onsite visit . . . ." According to the MPR report, "Fuji concluded that there was 'no causal relationship between the machined edge and [the] bushing incident,'" and "Fuji concluded that there [was] 'no causal relationship

between these scratches [or rub marks] and [the] bushing incident.'" Based on "[t]he post-event inspection of the damaged bushing, [investigators] found no evidence to conclude that a manufacturing defect or installation damage was the cause of the failure." MPR ultimately concluded that the root cause of the 2010 transformer failure was "indeterminate."

The MPR report also mentioned an earlier failure of a bushing in a transformer in either 2004 or 2006, which "was due to an internal oil leak according to Fuji."

In July 2016, Perez was working on piping insulation pads in an area near one of Fuji's transformers at the Cottonwood facility in Texas when the transformer allegedly "exploded, sending large shrapnel hurtling toward [Perez] and striking him violently," injuring him. A report of a third-party investigation of the transformer explosion revealed that an A-phase bushing in Fuji's transformer had failed. The transformer had been out of service due to flooding, and it "was being back fed and checked in preparation for returning to service." Seconds before the explosion, "oil was observed streaming out of the" area of the bushing in the transformer. The report found "fractured bushing porcelain radiating out from" one of the component bushings inside the transformer and a melted area of the transformer "that was most probably a termination point of the power arc." The report also found damage "as a result of the explosive forces and porcelain fragments expelled by the [bushing]

failure." The report did not reach a conclusion regarding the cause of the transformer and bushing failure.

Perez filed the underlying lawsuit in March 2017 against the owners, operators, and a maintenance manager of the Cottonwood facility, asserting claims for negligence, gross negligence, and premises liability. Perez added Fuji as a defendant, among others, in June 2018. In his fifth amended petition, which was his live petition when the trial court denied Fuji's special appearance, Perez alleged that Fuji "does business in Texas and/or purposefully manufactures, designs, sells, and/or distributes products in Texas." Perez alleged that Fuji "designed [its] products for use in Texas, marketed [its] products for use in Texas, and had channels for providing regular advice to customers in Texas." Perez alleged that Fuji and other defendants "manufactured and supplied the transformer(s) and/or bushing(s) and/or related parts involved or contributing to the incident[] and supplied other transformers with the same or similar specifications." Perez also alleged that Fuji and the other defendants "knew their products were intended for long-term use at a substantial project in Texas, they targeted their products for use in Texas, and certain of the sales documents expressly mention Texas."

Perez also relied on the earlier 2010 transformer explosion in his jurisdictional allegations, alleging that "there was a prior incident at the Cottonwood facility involving a transformer/bushing supplied by Fuji and Fuji America with the same or

similar specifications as the one that exploded in 2016," that "following that prior incident, multiple personnel of Fuji . . . purposefully and voluntarily came to Texas and also made representations directed into Texas regarding the products it had supplied following the prior incident," and that Fuji "voluntarily participated in the testing, investigation, communications, and other analysis regarding the transformers and bushings it had supplied." Perez further alleged that Fuji "may have made additional trips to Texas in connection with the transformers and bushings it had supplied to the Cottonwood facility." According to Perez, the transformer or its component bushing was defective, the defect "could and should have been discovered following the prior incident" in 2010, which Fuji participated in investigating, and Fuji's representations that it made in and directed at Texas caused the transformers to remain in service and eventually injure Perez.

In his live pleading, Perez asserted causes of action for negligent misrepresentation, negligence, gross negligence, and products liability against Fuji.[1]

---

[1]    Perez also asserted a premises liability claim against any defendant who "owned, occupied, maintained, and/or controlled the area where [Perez] was injured sufficient to trigger premises liability standards." Perez specifically named several defendants who "owned, controlled, operated, supervised, maintained, overs[aw], [and] directed" the Cottonwood facility, but did not name Fuji. *See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 473 (Tex. 2017) (stating owner or occupier of property generally has duty to keep premises under control in safe condition, though defendant who assumes control over and responsibility for premises or who has right to control premises, which may be expressed by contract or implied conduct, may be liable under premises liability theory); *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992) (stating cause of action for premises liability concerns condition of premises). Nor does Perez argue on appeal that he asserts a

Perez's negligent misrepresentation claim was based on representations Fuji allegedly made when it voluntarily sent its personnel to Texas in 2010 to participate in the investigation of the 2010 transformer explosion. Perez's negligence and gross negligence claims were also based in large part on Fuji's conduct during the investigation of the 2010 transformer explosion and knowledge of the risks following that explosion. Perez's products liability claim was based on Fuji's design, manufacture, market, sale, alteration, and maintenance of the transformer that allegedly injured him, and he contended that the transformers were defective and unreasonably dangerous at the time Fuji sold them.

Fuji filed a special appearance challenging the trial court's exercise of personal jurisdiction over it. Fuji supported its special appearance with a written statement from a senior manager of its legal office, stating that Fuji is a Japanese company with no offices, property, bank accounts, subsidiaries, employees, registered agents for service of process, telephone listings, or facilities of any kind in Texas. It also stated that Fuji designed, manufactured, marketed, and tested "the transformer at issue" in Japan and that Fuji sold the transformer to a third party in Japan, thus placing it into the stream of commerce in Japan. Finally, the statement denied that Fuji altered or maintained "the transformer at issue in Texas." Fuji also

premises liability claim against Fuji. Therefore, we presume that Perez did not assert a claim for premises liability against Fuji.

produced a purchase order and a pricing and commercial data sheet for the eleven transformers showing that they were ordered from Fuji in 2001 at a total cost of nearly $14 million, more than $5 million of which was solely for the four transformers for the Cottonwood facility. The data sheet showed delivery dates for the eleven transformers between February and April 2002, although the document does not indicate whether those were actual or anticipated delivery dates.

Perez responded that the trial court could exercise specific jurisdiction over Fuji based on the trip to Texas in 2010 by Fuji representatives to participate in the investigation of the 2010 transformer explosion and that the defect "could and should have been discovered following the first explosion in 2010 so as to avoid the second explosion, which severely injured [Perez]." Perez also argued that Fuji had minimum contacts with Texas "at the time of the sale of the transformers":

> The transformers and bushings were not stock parts ordered off the internet which fortuitously and accidentally found their way to Texas. The very early evidence suggests that the transformers and bushings cost more than $4 million and were sold specifically in connection with—at least in part—a substantial Texas project and designed specifically for that Texas project and designed for long-term use at that Texas project. . . . Fuji designed the product for use in Texas and may have marketed the product for sale and use in Texas.

Perez produced the third-party investigative reports of the 2010 and 2016 transformer explosions, which we discussed above. Perez also relied on a pricing and commercial data sheet, an excerpt of Fuji's exhibit, which showed that Fuji sold four transformers for the Cottonwood facility at a cost greater than $5 million. Perez

also produced Fuji's bushing diagrams, which showed the same four transformers and referenced "Cottonwood" and "Cottonwood Energy Project," and a diagram of the bushing.

After the trial court allowed him to conduct additional jurisdictional discovery, Perez supplemented his special appearance response with an internal Fuji document entitled "Site Visit Report," which Perez argued showed that Fuji made misrepresentations about the cause of the 2010 transformer explosion. The document concerned Tamura's and Matsuyama's site visit to the Cottonwood facility, which we discussed above as referenced in the MPR report of the 2010 incident. Under "Probable Cause and Future Investigations," the Site Visit Report stated:

> The cause of this accident is believed to be a bushing flaw, which raised questions about similar accidents.
>
> Explained that there was a similar bushing accident in 2006 (damage due to a bushing oil leak), and also an accident with a low voltage class bushing.
>
> . . . .
>
> (The primary cause of this type of accident is presumed to be that the bushing insulator somehow becomes scratched, which allow[s] moisture (or water) to permeate, eventually leading to an accident.)

Perez contended this report showed that Fuji knew its conclusions to MPR—that "there was 'no causal relationship between the machined edge and [the] bushing incident'" and that "there [was] 'no causal relationship between these scratches [or rub marks] and [the] bushing incident'"—were false. The Site Visit Report also

stated that there were two options for repairing the transformer: either ship it to Japan for Fuji to repair, or repair it domestically in the United States, in which case Fuji would "only provide the components."

After the parties' voluminous briefing and a hearing in the trial court, the court denied Fuji's special appearance, ruling "that there is specific jurisdiction over" Fuji. This appeal followed.

**Special Appearance**

Fuji argues that the trial court erred by asserting personal jurisdiction over Perez's claims against it because it lacks minimum contacts with Texas such that exercising jurisdiction would offend traditional notions of fair play and substantial justice.

## A.    Standard of Review

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). When, as here, a trial court does not issue findings of fact and conclusions of law with its ruling on a special appearance, we imply all relevant facts necessary to support the judgment that are supported by evidence. *Id.*; *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). When the record on appeal includes the clerk's and reporter's records, the trial court's implied findings are not conclusive and may be challenged for legal and factual sufficiency.

*Marchand*, 83 S.W.3d at 795. A no-evidence legal sufficiency challenge fails if the finding is supported by more than a scintilla of evidence. *Id.*

**B.     Governing Law**

Texas courts may exercise personal jurisdiction over a nonresident defendant if: (1) the Texas long-arm statute authorizes the exercise of jurisdiction; and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. *Bell*, 549 S.W.3d at 558. The Texas long-arm statute is expressly satisfied if, "[i]n addition to other acts that may constitute doing business," a nonresident: "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state" or if a nonresident "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. However, "allegations that a tort was committed in Texas do not necessarily satisfy the United States Constitution." *Bell*, 549 S.W.3d at 559.

"[F]ederal due process requires that the nonresident must have 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), and citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007)). A nonresident establishes minimum contacts with a forum when it "purposefully avails itself of the privilege of conducting activities in the forum state, thus invoking the benefits and protections

of its laws." *Drugg*, 221 S.W.3d at 575 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), and *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005)). The defendant's in-state activities "must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Bell*, 549 S.W.3d at 559 (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)).

When determining whether a defendant has purposefully availed itself of the privilege of conducting activities in Texas, we consider three factors:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. . . . Finally, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction.

*Id.* (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013)); *TV Azteca v. Ruiz*, 490 S.W.3d 29, 38 (Tex. 2016) (stating that defendant's contacts must be "purposefully directed" at Texas and "must result from the defendant's own 'efforts to avail itself of the forum'"). A nonresident may purposefully avoid a jurisdiction "by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Holten*, 168 S.W.3d at 785. We assess the quality and the nature of the contacts, not the quantity. *TV Azteca*, 490 S.W.3d at 38.

A defendant's contacts may give rise to general jurisdiction or specific jurisdiction. *Bell*, 549 S.W.3d at 559; *M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2017). General jurisdiction, which is not at issue in this case,[2] is established when a defendant's contacts with the state "are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *M&F Worldwide*, 512 S.W.3d at 885 (quoting *Goodyear Dunlop Tires Operations, SA v. Brown*, 564 U.S. 915, 919 (2011)). For a Texas court to exercise specific jurisdiction over a nonresident defendant: (1) the defendant's contacts with Texas must be purposeful; and (2) the cause of action must arise from or relate to those contacts. *Bell*, 549 S.W.3d at 559 (citing *Moncrief Oil*, 414 S.W.3d at 150, and quoting *Holten*, 168 S.W.3d at 795); *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017) (stating that, for specific jurisdiction to exist, "[t]here must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation'" and that specific jurisdiction "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction").

---

[2]     Perez did not argue in the trial court and does not argue on appeal that Fuji is subject to general personal jurisdiction in this case, and the trial court's order denying Fuji's special appearance specifically determined that it had specific personal jurisdiction over Fuji.

"[A] seller's awareness 'that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.'" *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) (citations omitted). The Texas Supreme Court has held that "some 'additional conduct'—beyond merely placing the product in the stream of commerce—that indicates 'an intent or purpose to serve the market in the forum State'" is generally required to find purposeful contact with the forum. *Id.* (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 112 (1987), *Drugg*, 221 S.W.3d at 577, and *Holten*, 168 S.W.3d at 786). Examples of additional conduct include: (1) designing the product for the market in the forum state; (2) advertising in the forum state; (3) establishing channels for providing regular advice to customers in the forum state; and (4) marketing the product through a distributor who has agreed to serve as the sales agent in the forum state. *Id.* (quoting *Asahi*, 480 U.S. at 112, and citing *Drugg*, 221 S.W.3d at 577, *Holten*, 168 S.W.3d at 786, and *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex. 1985)).

The defendant's purposeful contacts "must be substantially connected to the operative facts of the litigation or form the basis of the cause of action." *Bell*, 549 S.W.3d at 559–60 (citing *Drugg*, 221 S.W.3d at 585); *accord Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("For a State to exercise jurisdiction consistent with due

process, the defendant's suit-related conduct must create a substantial connection with the forum State."). Operative facts are the facts that "will be the focus of the trial, will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question." *Drugg*, 221 S.W.3d at 585. "A substantial connection can result from even a single act." *Moncrief Oil*, 414 S.W.3d at 151–52 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

In analyzing specific jurisdiction, we focus on the relationship between the forum, the defendant, and the litigation. *Bell*, 549 S.W.3d at 559; *see Walden*, 571 U.S. at 285 ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."). "[A] defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties," but "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Walden*, 571 U.S. at 286. Specific jurisdiction must be established on a claim-by-claim basis unless all the asserted claims arise from the same contacts with the forum. *M&F Worldwide Corp.*, 512 S.W.3d at 886; *Moncrief Oil*, 414 S.W.3d at 150–51.

When personal jurisdiction is challenged, the plaintiff and the nonresident defendant bear shifting burdens of proof. *Bell*, 549 S.W.3d at 559; *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff bears the

initial burden to plead sufficient allegations to bring the nonresident defendant within the scope of Texas's long-arm statute. *Bell*, 549 S.W.3d at 559; *Kelly*, 301 S.W.3d at 658 ("Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading."). The trial court may consider the plaintiff's original pleadings as well as its response to the defendant's special appearance in determining whether the plaintiff satisfied his initial burden. *Washington DC Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 738 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.). If the plaintiff fails to plead facts bringing the defendant within the reach of the long-arm statute, "the defendant need only prove that it does not live in Texas to negate jurisdiction." *Kelly*, 301 S.W.3d at 658–59. In conducting our review, we accept as true the allegations in the petition. *Touradji*, 316 S.W.3d at 23; *Pulmosan Safety Equip. Corp. v. Lamb*, 273 S.W.3d 829, 835–36 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 867 (Tex. 2002)).

If the plaintiff meets its initial pleading burden, the burden shifts to the nonresident defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *Bell*, 549 S.W.3d at 559; *Kelly*, 301 S.W.3d at 658. The defendant can negate jurisdiction on either a factual or a legal basis. *Kelly*, 301 S.W.3d at 659.

Factually, the defendant can present evidence that it has no contacts with Texas, "effectively disproving the plaintiff's allegations." *Id.* Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; that the defendant's contacts with Texas do not constitute purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts with Texas; or that the exercise of jurisdiction offends traditional notions of fair play and substantial justice. *Id.* The plaintiff can then respond with his own evidence affirming his allegations, and if he does not present evidence establishing personal jurisdiction, he risks dismissal of his suit. *Id.*

"Jurisdiction cannot turn on whether a defendant denies wrongdoing—as virtually all will. Nor can it turn on whether a plaintiff merely alleges wrongdoing—again as virtually all will." *Bell*, 549 S.W.3d at 560 (quoting *Holten*, 168 S.W.3d at 791). When conducting a jurisdictional analysis, "we must not confuse 'the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits.'" *Id.* (quoting *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 70 (Tex. 2016)).

## C.     Purposeful Availment

The parties dispute which contacts Fuji had with Texas. Fuji's arguments focus on disputing any contacts related to the investigation of the 2010 transformer failure. Perez relies on those contacts, but he also relies on Fuji's contacts when it

designed, manufactured, marketed, and sold the batch of eleven transformers in 2001.

### 1. *Fuji's Pre-2010 Contacts*

Fuji first argues that it merely placed its transformers into the stream of commerce in Japan by selling them to a third-party company, Fuji America, in Japan, after which Fuji had no further involvement with the transformers. Fuji contends that the mere presence of its transformers in Texas or the unilateral actions of others bringing its products into Texas does not subject it to jurisdiction here. Perez responds that he does not rely on a stream-of-commerce theory to assert jurisdiction over Fuji, but on Fuji's design and manufacture of the transformers with the knowledge that they were intended for long-term use at a substantial project in Texas.

Perez alleged that Fuji does business in Texas, that it designs, manufactures, sells, and distributes products in Texas, including the transformer and component bushing that injured Perez, and that it supplied other transformers with the same or similar specifications. He also alleged that Fuji "voluntarily participated in the testing, investigation, communications, and other analysis regarding the transformers and bushings it had supplied" and that Fuji designed its products for use in Texas, marketed its products for use in Texas, and "had channels for providing regular advice to customers in Texas." Regarding the eleven transformers Fuji

designed and manufactured in 2001, including the specific one that he alleges injured him, Perez alleged that Fuji knew its transformers "were intended for long-term use at a substantial project in Texas, [it] targeted [its] [transformers] for use in Texas, and certain of the sales documents expressly mention Texas." Perez supported these allegations with Fuji's pricing and commercial data sheet and bushing diagrams, which show that Fuji knew, when it designed and manufactured the transformers, that they were intended for long-term use at a substantial project in Texas as well as in Oklahoma and Mississippi. We conclude that these jurisdictional allegations meet Perez's initial burden to allege that Fuji was doing business in Texas under the long-arm statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *see also Marchand*, 83 S.W.3d at 795 (stating that statutory list of activities constituting doing business in Texas "is not exclusive" and "extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit'"). The burden thus shifted to Fuji to negate these jurisdictional allegations with evidence. *See Bell*, 549 S.W.3d at 559; *Kelly*, 301 S.W.3d at 658.

Fuji's evidence included a written statement from a legal manager, stating that Fuji designed, manufactured, marketed, and tested "the transformer at issue" in Japan, and sold it to Fuji America in Japan, thus placing it in the stream of commerce in Japan. However, the statement does not deny that Fuji knew when it designed and manufactured the transformers that they were intended for a specific, long-term,

substantial project at the Cottonwood facility in Texas and the facilities in Oklahoma and Mississippi. *See Kelly*, 301 S.W.3d at 658, 659 (stating that, once plaintiff pleads sufficient jurisdictional allegations, burden shifts to defendant to negate all jurisdictional allegations, such as with evidence it lacks forum contacts). None of Fuji's evidence rebuts Perez's allegations regarding Fuji's contacts with Texas at the time it designed and manufactured the eleven transformers. Thus, because Fuji did not meet its burden to negate these jurisdictional allegations, we assume for purposes of our analysis that they are true. *See Bell*, 549 S.W.3d at 559; *Kelly*, 301 S.W.3d at 658; *Touradji*, 316 S.W.3d at 23; *Lamb*, 273 S.W.3d at 835–36.

These contacts show that Fuji was not merely aware that the stream of commerce would send its transformers into Texas, but that it intended to serve the market in Texas. *See Spir Star*, 310 S.W.3d at 873 (stating purposeful contact requires "some 'additional conduct'—beyond merely placing the product in the stream of commerce—that indicates 'an intent or purpose to serve the market in the forum State'"). Perez's unrebutted allegations show that Fuji designed its transformers, including the two that failed in 2010 and 2016, for the Texas market, advertised in Texas, and established channels for providing regular advice to customers in Texas. *See id.* (stating that examples of additional conduct include (1) designing product for market in forum, (2) advertising in forum, (3) establishing channels for providing regular advice to customers in forum, and (4) marketing

product through distributor serving as sales agent in forum); *see also Bell*, 549 S.W.3d at 559 (stating that, once plaintiff pleads sufficient jurisdictional allegations, burden shifts to nonresident defendant to negate all bases of personal jurisdiction alleged by plaintiff). Fuji also distributed its transformers through Fuji America, to whom Fuji concedes it sold the transformers. *See Spir Star*, 310 S.W.3d at 873. This is Fuji's own conduct, and it is not random, fortuitous, or attenuated. *See Bell*, 549 S.W.3d at 559. Fuji also profited from the sale of these transformers, which cost more than $1 million each for a total of $14 million, more than $5 million of which was for the transformers for the Cottonwood facility alone. *See id.*; *TV Azteca*, 490 S.W.3d at 38 (stating contacts "must result from the defendant's own 'efforts to avail itself of the forum'").

Fuji argues that it lacks minimum contacts because it sold the transformers to a third-party company in Japan and because the transformer that injured Perez was initially delivered to and used in Mississippi before being sent to Texas. However, we are only concerned with Fuji's conduct, not with the unilateral activity of third persons. *See Bell*, 549 S.W.3d at 559. When a foreign manufacturer "specifically targets Texas as a market for its products," as Fuji did, "that manufacturer is subject to a product liability suit in Texas based on a product sold here, even if the sales are conducted through a Texas distributor or affiliate." *See Spir Star*, 310 S.W.3d at 874 (citing *Asahi*, 480 U.S. at 112). "In such cases, it is not the actions of the Texas

intermediary that count, but the actions of the foreign manufacturer who markets and distributes the product to profit from the Texas economy." *Id.*; *accord Bell*, 549 S.W.3d at 559 ("[O]nly the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person."). It is irrelevant that Fuji did not personally deliver the transformer to the Cottonwood facility, considering it specifically targeted the Texas market with its products, including the eleven transformers it designed and manufactured in 2001, two of which exploded and "catastrophically failed" at the same Cottonwood facility in Texas. Perez does not assert a claim against Fuji for the transportation of the transporters through Fuji America's conduct, as Fuji contends, but only for Fuji's own conduct. *See Bell*, 549 S.W.3d at 559. Thus, we conclude that Fuji purposefully availed itself of conducting activities in Texas when it designed, manufactured, marketed, distributed, and sold its transformers in Texas, voluntarily participated in the testing, investigation, communications, and other analysis of its transformers, and established channels for providing regular advice to customers in Texas. *See id.*

### 2. *Fuji's 2010 and Post-2010 Contacts*

Perez also alleges that, after the 2010 transformer explosion, Fuji purposefully and voluntarily sent its representatives, Tamura and Matsuyama, to the Cottonwood facility in Texas to participate in the investigation of the 2010 explosion, and that Fuji made misrepresentations about defects related to the design and manufacture of

its transformers, which influenced the third-party investigation into the cause of the explosion. Perez further alleges that Fuji made additional trips to Texas concerning its transformers at the Cottonwood facility. Based on Fuji's actions in or directed into Texas, Perez contends Fuji's transformers were "deemed non-defective and continued to be used at the Cottonwood [facility]." Moreover, according to Fuji's internal Site Visit Report, the only options for repairing the transformer that exploded in 2010 were to send it to Fuji in Japan for repairs or to repair it in the United States with component parts supplied by Fuji.

Fuji disputes that Tamura and Matsuyama represented it during their 2010 trip to Texas, instead arguing that they represented another company, Japan AE Power Systems, a joint venture whose contacts cannot be attributed to Fuji. We disagree. An agent's authority to act on behalf of a principal can be actual or express authority, which depends on some communication by the principal to the agent, or apparent or implied authority, which depends on some communication by the agent to the third party. *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). Apparent authority, which is based on estoppel, arises either from (1) "a principal knowingly permitting an agent to hold [himself] out as having authority" or (2) "a principal's actions which lack such ordinary care as to clothe an agent with indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise." *Id.* (quoting *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948

(Tex. 1998)). "An agent acting within the scope of her apparent authority binds a principal as though the principal herself had performed the action taken." *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984) (citing *Biggs v. United States Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981)).

According to the MPR report of the 2010 explosion, investigators "[m]et with Messrs[.] Tamura and Matsuyama, representatives of Fuji Electric (the original equipment manufacturer) at the Cottonwood site [in Texas] on July 14, 2010[.]" A footnote states that "Fuji . . . is now part of Japan AE Power Systems." The report expressly states that Tamura and Matsuyama were "representatives of Fuji," which is evidence that Tamura and Matsuyama had apparent or implied authority to act on Fuji's behalf. *See Gaines*, 235 S.W.3d at 182. Even if Fuji became "part of" Japan AE Power Systems, the report clearly states they represented Fuji. Moreover, the Site Visit Report listing Tamura and Matsuyama under "JAEPS," presumably Japan AE Power Systems, is Fuji's internal document and does not undermine the apparent or implied authority communicated to third parties in the MPR report. *See id.* Thus, because some evidence exists showing that Tamura and Matsuyama were representatives of Fuji, we conclude that the evidence is legally sufficient to support the assertion. *See Marchand*, 83 S.W.3d at 795.

But, perhaps more importantly, the MPR report says that Fuji itself—not Tamura, Matsuyama, or anyone else—made the representations at issue here. In a

section on potential manufacturing or installation defects, the report states that investigators found "a small machining or fabrication defect" and "rub marks" or scratches on the component bushing. The report states that after discussing the small defect and rub marks or scratches "with Fuji during their onsite visit . . . Fuji concluded that there was 'no causal relationship between the machined edge and bushing incident" and that "Fuji concluded that there [was] 'no causal relationship between these scratches and bushing incident." Moreover, Fuji's internal Site Visit Report states, "The cause of this accident [involving the explosion of the Fuji transformer in 2010] is believed to be a bushing flaw, which raised questions about similar accidents," and, "The primary cause of this type of accident is presumed to be that the bushing insulator somehow becomes scratched, which allow[s] moisture (or water) to permeate, eventually leading to an accident." None of these comments are attributed to Tamura or Matsuyama, but rather they are attributed directly to Fuji. Fuji did not produce any contradictory evidence. *See Bell*, 549 S.W.3d at 559; *Kelly*, 301 S.W.3d at 658. The statement from Fuji's senior legal office manager, which Fuji offered as evidence in support of its special appearance, does not mention Tamura, Matsuyama, or Japan AE Power Systems or anything about the representations at issue here. We conclude that the evidence is legally sufficient to show that Fuji made the representations concerning the cause of the 2010 explosion. *See Marchand*, 83 S.W.3d at 795.

Finally, Perez alleges that Fuji "may have made additional trips to Texas in connection with the transformers and bushings it had supplied to the Cottonwood facility," that the defects could and should have been discovered following the 2010 incident, and that, based on Fuji's representation "in Texas and directed at Texas as well as omissions in the investigation, the bushings and transformers were deemed non-defective and continued to be used at the Cottonwood [facility]." Fuji did not offer any evidence rebutting these allegations, and therefore it did not meet its burden to negate these jurisdictional allegations. *See Bell*, 549 S.W.3d at 559; *Kelly*, 301 S.W.3d at 658. We therefore consider them true for purposes of our analysis. *See Touradji*, 316 S.W.3d at 23; *Lamb*, 273 S.W.3d at 835–36.

These were Fuji's own contacts, and they were not random, fortuitous, or attenuated. *See Bell*, 549 S.W.3d at 559. Fuji purposefully and voluntarily sent its representatives to Texas to participate in the investigation of the 2010 transformer explosion, Fuji made the alleged misrepresentations at issue in Texas to the investigators, and Fuji made additional trips to Texas regarding its transformers at the Cottonwood facility. Fuji argues that it travelled to Texas at the request of a third party, but there is no record evidence contradicting Perez's allegation that Fuji voluntarily chose to travel to Texas to participate in the investigation of the 2010 transformer explosion, to make various representations about the cause of the explosion, and to make additional trips to Texas. Fuji also benefitted from its

transformers remaining in use at the Cottonwood facility, considering that it designs, manufactures, markets, and sells its products in Texas and has established channels for providing regular advice to its customers in Texas. *See id.* We conclude that Fuji's 2010 and post-2010 contacts were purposeful.

**D.    Substantial Connection to Products Liability Claims**

Perez asserted products liability claims against Fuji, alleging that it "designed, manufactured, marketed, sold, altered, and/or maintained the transformer and bushing and monitor and/or other component parts involved in or contributing to" his injury, that the transformer and other parts "were in substantially the same condition and were being used in a manner intended and/or foreseeable at the time of" his injury, that Fuji was negligent and grossly negligent in designing, manufacturing, marketing, and providing warnings and instructions about the parts, and that the parts were defective and unreasonably dangerous when Fuji sold them.

Perez's products liability claims against Fuji will require proof that Fuji's transformer was in a defective or unreasonably dangerous condition when it was sold and proof that the condition caused his injury. *See Ranger Conveying & Supply Co. v. Davis*, 254 S.W.3d 471, 479 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (stating elements of products liability action: (1) defendant placed the product into stream of commerce; (2) product was in defective or unreasonably dangerous condition; and (3) there was causal connection between condition and plaintiff's

injuries or damages) (citing *Houston Lighting & Power Co. v. Reynolds*, 765 S.W.2d 784, 785 (Tex. 1988), and *Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374, 376 (Tex. 1978)). Whether a product is unreasonably dangerous is generally a fact question for a jury to decide. *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 432 (Tex. 1997) (citing *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 848 (Tex. 1979)).

The operative facts at trial will focus on whether Fuji designed and manufactured the transformer that injured Perez in Texas, whether Fuji specifically manufactured the transformers for specific projects in Texas, and whether the explosion occurred because of a faulty design or manufacturing or marketing defect. *See Davis*, 254 S.W.3d at 479. Fuji has not presented any evidence showing, as a matter of law, that it did not design or manufacture the transformer or that, as a matter of law, the transformer or its component bushing could not have been defective. *See id.* At this stage of litigation, Perez need not prove his claims, and we do not decide whether the evidence that has been presented to the trial court at this stage is sufficient to ultimately prove Perez's claims. *See Bell*, 549 S.W.3d at 560 (stating that reviewing courts "must not 'confuse the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits'") (citation omitted). We do conclude, however, that Perez's products liability claims against Fuji arise

from or relate to Fuji's purposeful contacts with Texas and "justify a conclusion that [Fuji] could reasonably anticipate being called into a Texas court." *See id.* at 559.

**E.      Substantial Connection to Negligent Misrepresentation, Negligence, and Gross Negligence Claims**

Perez's negligence and gross negligence claims against Fuji are based in large part on his allegations that Fuji misrepresented the cause of the 2010 transformer explosion to third-party investigators, which caused the transformers to continue in use and injure Perez six years later at the same facility in Texas. The MPR report of the 2010 explosion stated that investigators found "a small machining or fabrication defect" and "four rub marks" or scratches on the component bushings, which investigators discussed with Fuji during the onsite visit. The report stated that "Fuji concluded that there was 'no causal relationship between the machined edge and [the] bushing incident'" and that "Fuji concluded that there [was] 'no causal relationship between these scratches [or rub marks] and [the] bushing incident.'" Based on the "post-event inspection of the damaged bushing," part of which was completed with Fuji's representatives, investigators found "no evidence to conclude that a manufacturing defect or installation damage was the cause of the failure." However, according to Fuji's internal Site Visit Report, completed after the 2010 explosion, Fuji actually believed that the cause of the incident was "a bushing flaw, which raised questions about similar accidents," and Fuji knew that the "primary cause of this type of accident is presumed to be that the bushing insulator somehow

becomes scratched, which allow[s] moisture (or water) to permeate, eventually leading to an accident." Both the MPR report and the Site Visit Report state that a third bushing failed in 2004 or 2006.

To prove his negligent misrepresentation claim at trial, Perez will be required to show that (1) Fuji made a representation in the course of business or a transaction in which it had a pecuniary interest; (2) Fuji supplied "false information" for the guidance of others in their business; (3) Fuji did not exercise reasonable care or competence in obtaining or communicating the information; and (4) Perez was injured by justifiably relying on the representation. *See Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). The operative facts of Perez's negligent misrepresentation claims will focus on whether Fuji had reason to suspect that its transformers were faulty based on the 2010 explosion and the 2004 or 2006 bushing failure but nevertheless, while in Texas, lied about the condition of at least one of its four transformers that were being used in a Texas facility, causing the transformers to continue in use at the same Cottonwood facility where Perez was injured by a second (or third) Fuji transformer explosion. *See id.*

The operative facts of Perez's negligence claims will focus on whether Fuji breached a duty during its participation in the investigation of the 2010 transformer explosion by representing that the cause of the explosion was not due to defects in the transformers despite having a reason to suspect they were faulty. *See Lee Lewis*

*Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001) (stating negligence requires evidence of legal duty owed by defendant to plaintiff, breach of that duty, and damages proximately caused by that breach). Perez's gross negligence claims will focus on whether Fuji had actual, subjective awareness that its transformers involved an extreme degree of risk of explosion after the 2010 incident and the earlier 2004 or 2006 incident, but nevertheless lied about the risks and caused the transformers to remain in service at the Cottonwood facility where Perez was later injured. *See id.* at 785 ("[G]ross negligence involves two components: (1) viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed[s] in conscious indifference to the rights, safety, or welfare of others.'"); TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (providing same definition of gross negligence).

Fuji contends that differences between the 2010 and 2016 explosions are too great to substantially connect them, arguing that a C-phase bushing failed in 2010 and involved machining defects and rub marks or scratches, while the 2016 explosion involved an A-phase bushing and there was no indication of machining defects, rub marks, or scratches. However, we are not reviewing the merits of Perez's claims or determining whether he can ultimately prevail in his claims against Fuji.

*See Bell*, 549 S.W.3d at 560 (stating that reviewing courts "must not confuse 'the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits'") (citation omitted). We are only reviewing Fuji's jurisdictional contacts. The evidence shows that Fuji voluntarily came to Texas in 2010 to participate in the investigation of the 2010 transformer explosion, Fuji made misrepresentations about the cause of the 2010 incident during that trip, and Fuji made additional trips to Texas concerning its transformers in use at the Cottonwood facility. We also note that Fuji's internal Site Visit Report stated that there were only two options to repair the transformer that failed in 2010: either send it to Japan for Fuji to repair it, or repair it in the United States with parts supplied by Fuji. We conclude that Perez's negligent misrepresentation, negligence, and gross negligence claims are substantially connected to Fuji's in-state activities. *See Walden*, 571 U.S. at 284; *Bell*, 549 S.W.3d at 559–60 (citing *Drugg*, 221 S.W.3d at 585).

In sum, the trial court correctly determined that it can exercise specific jurisdiction over each of Perez's claims.

## F.     Traditional Notions of Fair Play and Substantial Justice

"Only in rare cases . . . will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Spir Star*, 310 S.W.3d at 878 (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815

S.W.2d 223, 231 (Tex. 1991)). In reviewing this component, we must consider Fuji's contacts in light of (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several nations or states in furthering fundamental substantive social policies. *Id.* (quoting *Guardian Royal*, 815 S.W.2d at 231). When the defendant, like Fuji, is a resident of a foreign country, we also consider (6) the unique burdens placed upon the defendant who must defend itself in a foreign legal system, (7) the state's regulatory interests, and (8) the procedural and substantive policies of other nations whose interests are affected as well as the federal government's interest in its foreign relations policies. *TV Azteca*, 490 S.W.3d at 55 (quoting *Guardian Royal*, 815 S.W.2d at 229). To defeat jurisdiction, Fuji must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable . . . ." *See Spir Star*, 310 S.W.3d at 878–79 (quoting *Guardian Royal*, 815 S.W.2d at 231).

Fuji first argues that its burden, which it contends "must be given 'significant weight,'" consists of having to travel from Japan to Texas to defend itself in foreign litigation and that it would "be left to carry the burden of defending its products alone" because the manufacturer of the component bushing has been dismissed from the lawsuit. Fuji's having to travel from Japan to Texas to participate in this litigation

does not defeat jurisdiction. *See id.* at 879 (finding that company's headquarters in Germany was insufficient, without more, to defeat jurisdiction); *Guardian Royal*, 815 S.W.2d at 231 ("Nor is distance alone ordinarily sufficient to defeat jurisdiction: 'modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.'") (quoting *McGee*, 355 U.S. at 223). Fuji itself has shown that the burden of traveling to Texas is minimal by sending two representatives to Texas after the 2010 explosion to participate in the investigation, making other trips to Texas regarding its transformers at the Cottonwood facility, and setting up channels for providing regular advice to its customers in Texas. Fuji faces the same burden as every nonresident, which is not, by itself, a compelling case that jurisdiction is unreasonable. *See Spir Star*, 310 S.W.3d at 878–79.

Moreover, having to defend its product without other potentially liable third parties is irrelevant to our inquiry. At this stage in the proceedings, we are not concerned with the merits of Perez's claims or whether he can ultimately prove them against Fuji, alone or with other defendants; we are only concerned with whether those claims arise from or substantially connect to Fuji's in-state activities in Texas. *See Bell*, 549 S.W.3d at 560. While we recognize that litigating against all defendants in a single forum promotes judicial economy, the record on appeal does not include any order dismissing other parties from the case or other compelling evidence

showing that jurisdiction is unreasonable based on the parties that remain in the litigation. *See Spir Star*, 310 S.W.3d at 878–79. To the contrary, Fuji's voluminous briefing in the trial court and its arguments on appeal indicate it is sufficiently able to litigate in Texas courts.

Fuji next argues that exercising jurisdiction in this case "intrudes into the purview of the Federal government and U.S. foreign policy" and that the "impact of both the burden on Fuji . . . and on foreign relations is entirely unjustified." However, Fuji does not explain how a products liability and negligence action against it for its own conduct in Texas unjustifiably impacts foreign policy and foreign relations simply because it is a Japanese company. Nor does Fuji offer any evidence supporting its assertions.

The minimal burden to Fuji is outweighed by Texas's interest in adjudicating this dispute and by Perez's interest in obtaining convenient and effective relief. *See id.* at 878. The United States Supreme Court has stated that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114. However, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id.* Here, "Texas has a significant interest in

exercising jurisdiction over controversies arising from injuries a Texas resident sustains from products that are purposefully brought into the state and purchased by Texas companies." *See Spir Star*, 310 S.W.3d at 879 (citing *Asahi*, 480 U.S. at 114). Perez likewise has a significant interest in obtaining convenient and effective relief in the forum he chose to file this lawsuit. *See Retamco Operating*, 278 S.W.3d at 341 ("[The plaintiff] has an interest in resolving this controversy in Texas because that is where the litigation began."). We conclude that Fuji has not shown that this is a rare or compelling case in which exercising jurisdiction is unreasonable despite Fuji's minimum contacts with Texas. *See Spir Star*, 310 S.W.3d at 878–79; *see also Asahi*, 480 U.S. at 114 ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.").

Finally, we note that Fuji has also argued for the first time in its reply brief that Perez's "interest in having Fuji . . . as a defendant is nonexistent" because Perez filed his lawsuit more than fifteen years after the date of the sale of Fuji's transformers. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.012(b) ("[A] claimant must commence a product liability action against a manufacturer or seller of a product before the end of 15 years after the date of the sale of the product by the defendant."). A party waives an argument that it raises for the first time in a reply brief. *N.P. v. Methodist Hosp.*, 190 S.W.3d 217, 225 (Tex. App.—Houston [1st

Dist.] 2006, pet. denied) (citation omitted). Moreover, the statute of repose has nothing to do with whether the trial court properly asserted personal jurisdiction over Fuji. Because we conclude that Fuji has not met its burden to negate the bases of specific jurisdiction alleged against it, we hold that the trial court did not err in denying Fuji's special appearance and exercising specific personal jurisdiction over Fuji. Accordingly, we overrule Fuji's issue.

## Conclusion

We affirm the trial court's order denying Fuji's special appearance. We dismiss any pending motions as moot.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Lloyd, and Hightower.